On August 25, 1984, four people were killed at the Guest Service Station near *Page 132 
Attalla, Alabama. They were Ronald Michael Guest, the son of the station owner; Wilbur T. Nelson, an employee at the station; and Robert William Payne and his wife Nancy, customers present when the robbery occurred. Tommy J. Fortenberry was charged in a two-count indictment with the capital offense of murder wherein two or more persons are murdered, Alabama Code 1975, § 13A-5-40(a)(10), and robbery-murder, § 13A-5-40(a)(2). A jury found him "guilty as charged." After a sentencing hearing, that same jury unanimously recommended punishment by death. At the third stage of the capital trial proceedings, the trial judge held a separate sentencing hearing and sentenced the defendant to death by electrocution. Seven issues are raised on this appeal from that conviction.
 I
The defendant maintains that his confessions were obtained during an illegal detention and should not have been admitted at his trial. We disagree. In reaching this conclusion we have considered the testimony and evidence presented both at the hearing on the motion to suppress and at trial. Henry v. State,468 So.2d 896, 899 (Ala.Cr.App. 1984), cert. denied, Ex parteHenry, 468 So.2d 902 (Ala. 1985).
The murders were committed on August 25, 1984. Four men were indicted but were never prosecuted after it was discovered that the juvenile who had accused them was lying. Then, in March of 1985, James Jenkins found a .44-caliber magnum Ruger Super Blackhawk revolver on the bank of Black Creek in Alabama City. The pistol contained four empty cartridges. On April 18, 1985, Etowah County Sheriff Roy McDowell received information that Jenkins had found the weapon. The sheriff obtained the pistol and cartridges from Jenkins and delivered them to a state firearms expert, Lawden Yates, at the Birmingham crime lab. On April 22, 1985, Yates examined the pistol and determined that it was the weapon used to kill the four people at the Guest Service Station.
Marlin Carter, chief of the investigators for the Etowah County Sheriff's Office, obtained written statements from Ricky Downing, Thomas Neander, and Steve Whiteside, placing the .44 magnum in the hands of the defendant "a day or so before the shooting." Carter testified, "These three people had seen this murder weapon and knew the weapon, knew where it came from. And could positively identify it. They had seen this weapon in the possession of [the defendant]." The weapon had been stolen from the defendant's father, Jerry Fortenberry, and Jerry Gable, who were partners in a gun repair business located at Gable's residence. The pistol was especially distinctive because "somebody had had fashioned a bolt to retain the cylinder pin." Based upon this information, around 6:00 on the evening of May 2, 1985, Investigator Carter and three other investigators from the Sheriff's Office went to the residence of the defendant's father, where the twenty-one-year-old defendant was living. Investigator Johnny Grant testified that they went to talk to both the defendant and his father. The defendant's eighteen-year-old brother Terry answered the door. Carter asked for Terry's father and Terry said that he "was over at Jerry Gable's." Carter then asked if the defendant was there and Terry replied that he was. Investigator Carter said, "We would like to see him, to talk to him." Terry opened the door, said "come on in," and walked to a bedroom where the defendant was lying in bed. The four investigators followed Terry. Investigator Grant testified that the defendant had been sleeping but was awake when they entered the room. The defendant said that he had been to Montgomery the night before and had slept during that day. Carter testified that the defendant did not look tired. Carter testified that he said, "We need to talk with you, Tommy. We need to talk with you down at the Courthouse, we want you to go with us." The defendant did not say anything but "got up" and "put his clothes on." Captain Grant testified that Carter "told Tommy we needed to talk to him, would he mind coming down to our office with us, and Tommy got up" and that the *Page 133 
defendant "agreed and came." After that, Carter sent Grant and Investigator Hershel Womack to find the defendant's father, whom they needed to question about an unrelated pistol that had been reported stolen.
Investigators Carter and Aubrey Newman took the defendant to the courthouse. The defendant was not handcuffed but was read his Miranda rights when they left the house, even though he was not questioned at that time. Carter testified that the defendant "went with us willingly out to the car."
Carter testified that they arrived at the courthouse "about 6:45, or nearly 7:00" and went to the investigator's office on the third floor. At 6:53 that evening, the defendant signed a waiver of rights form. The defendant was questioned about the pistol used in the four murders at the Guest Service Station.
The defendant admitted taking the .44 magnum from his father and Gable. Between 9:00 and 10:00, the defendant, at the request of the officers, telephoned a friend. The record does not reveal the subject matter of that conversation. Around 11:00 or 11:30, the defendant was left alone with his father for "probably fifteen to thirty minutes." Investigator Carter testified that he "probably" would have allowed the father to stay with the defendant "if he had requested to." Around midnight, the defendant showed the investigators where he had disposed of the pistol, which had subsequently been discovered by Mr. Jenkins.
At 12:50 on the morning of May 3, 1985, the defendant gave a tape-recorded statement, claiming that Harvey Underwood was solely responsible for the robbery and the murders. The defendant did admit that he was present when the crime occurred, that Underwood got the murder weapon from him, and that he (the defendant) threw the pistol in the creek. The defendant was placed in a cell to sleep at approximately 2:15 that morning. Investigator Carter testified that at any time prior to the tape-recorded statement, the defendant "could have gotten up and left."
During the interval of approximately six hours between the time the defendant waived his rights until the tape-recorded statement was taken, he was questioned "on and off" and given something to eat. During that time, the investigators "checked out leads" the defendant had given them "to verify whether or not he had been telling us the truth." During this time, the defendant gave three different stories. Investigator Carter testified, "We would go over each statement until he decided that it wasn't true, and he would tell us another one, story. * * * Well, he would tell the same story, and then he would tell a little bit different. So we tried to check it out for him." Captain Grant testified, "We told him that the thing didn't check out, we needed to continue talking to him about it, not that we wanted another statement or we wanted him to say something else." Grant stated, "From the time he admitted that he stole the gun, yes, he would tell us all about it, and then, we would show him, you know, tell him what we had checked out, the story out, and it didn't fit, and he would start with another one."
Around 5:00 or 5:30 on the morning of May 3rd, Underwood was brought to the courthouse to face his accuser. There was testimony that this was done with the permission of both Underwood and the defendant. The defendant again accused Underwood of committing the murders, but Underwood "just practically got down on his knees and said, 'You know I didn't shoot nobody, you know. Why are you doing this?' "
At 5:25 on the afternoon of May 3rd, the defendant gave a handwritten statement admitting his responsibility for the robbery and murders. On Saturday, May 4, 1985, at 1:08 p.m., the defendant gave a detailed statement, recorded by a court reporter, admitting his guilt. On January 1, 1986, after he had escaped and been captured, the defendant gave a statement in the county jail in Bowling Green, Kentucky, wherein he again admitted his guilt.
Sometime before 5:00 on the afternoon of May 3, 1985, Investigators Grant and Carter, *Page 134 
and William Payne, the father of one of the victims, went to the clerk's office to get an arrest warrant for the defendant. Payne did not relate any facts to the magistrate other than that he was the father of one of the victims. The affidavit merely recites that Payne "has probable cause for believing and does believe that" the defendant intentionally caused the death of four people.
At the hearing on the motion to suppress, Gene Mitchell, the magistrate, testified that when Carter and Grant "asked for a warrant all they had was an incident report, and I needed something else to go on." Grant left and "brought another [sic] statement back from" the defendant. Mitchell stated that he "read the statement. And before reading the statement and after reading the statement I asked questions of Chief Carter." The trial court sustained the objection of defense counsel and refused to allow Mitchell to testify to anything that Investigators Carter and Grant told him.
At the hearing on the motion to suppress, Magistrate Mitchell should have been permitted to testify to the information he obtained from the officers before he issued the arrest warrant. It is well settled that information based on hearsay may support a finding of probable cause. Illinois v. Gates,462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); Waldrop v.State, 424 So.2d 1345, 1349 (Ala.Cr.App. 1982), cert. denied,Waldrop v. Alabama, 472 U.S. 1019, 105 S.Ct. 3483,87 L.Ed.2d 618 (Ala. 1985) ("multiple hearsay or hearsay upon hearsay is permissible in establishing probable cause").
At the suppression hearing, Mitchell identified the handwritten confession given by the defendant at 5:25 on the afternoon of May 3rd as "appearing" to be the statement he reviewed: "I can't — I'm not — that appears to be the statement." However, Investigator Grant testified that Chief Carter got a transcript of the tape-recorded interview with the defendant and delivered it to the magistrate. Grant also testified that the 5:25 statement was given after the arrest warrant had been issued. As explained in Part A of Part I of this opinion, the determination of which statement the magistrate actually considered is legally insignificant in deciding the issue of the legality of the defendant's arrest.
At the pretrial hearing on the motion to suppress his statements, the defendant did not testify. At trial, the defendant testified that, on the afternoon of May 2, 1985, he was sleeping in his bed and was awakened by Sheriff Carter pulling on his foot. The defendant was "real hazy" and "still drunk" from the previous night. He had a "real bad hangover." He stated that the officers said "let's go" and would not give him time to "comb [his] hair, or anything." He testified that when he confessed he was afraid to make a statement because he and his family had been threatened by Harvey Underwood. He stated that the police told him that "even if [he] didn't make the statement, that they were going to release it to the newspapers that [he] had made a statement on somebody, and that was still going to jeopardize [his] family." He was threatened with being sent to "fry" in the electric chair if he did not make a statement. The officers also threatened to "pull his father in" and question his mother and brother at their place of employment and "see if we can't get them fried." He was promised a life sentence if he would give a full statement and turn state's evidence. The defendant testified that, after he learned that the officers were not going to arrest Underwood, he confessed in order to protect his family from Underwood.
 A.
We find that the magistrate properly issued the arrest warrant based upon a showing of probable cause. At the conclusion of the hearing on the motion to suppress, the trial court stated:
 "[I]t is absolutely true that this case is — warrant was issued upon a bare bones affidavit which is strictly prohibited under Crittenden. However, in that case the Court makes it clear that if the magistrate has something before him in addition to the bare bones affidavit, then, *Page 135 
that warrant which otherwise would be invalid, therefore, a confession taken subsequent to it would be suppressed, can be validated, and I think in this case the testimony of Mr. Mitchell and Captain Grant that it has been validated. I think the magistrate had more to go on than just the bare bones affidavit and did have probable cause to issue the arrest warrant, and therefore, the statement given subsequent to that arrest warrant, assuming that he was Mirandized and warned, and so forth, is a statement that will not be suppressed."
The affidavit in support of the arrest warrant is merely a "bare-bones" type affidavit. "[A]ffidavits, like the one in the present action, which consist solely of the affiant's conclusion that the named individual committed an offense, without setting forth the facts upon which the conclusion is based, are fatally defective." Crittenden v. State,476 So.2d 632, 634 (Ala. 1985).
Here, the issuing magistrate recognized the defect in the affidavit, and required and obtained more information before he issued the warrant. We do not know what additional facts Investigator Carter told the magistrate because the trial court sustained defense counsel's objection and refused to allow the magistrate to testify about what Carter had told him. We do know that the magistrate reviewed one of the defendant's statements before issuing the warrant. If the magistrate reviewed the defendant's first statement, he knew that the defendant was with the alleged perpetrator immediately before and after the crime, that the defendant was present at the scene of the crime, that the perpetrator got the murder weapon from the defendant, and that the defendant disposed of the weapon after the crime. These facts supplied the probable cause to arrest the defendant. However, if the magistrate reviewed the defendant's second statement, he also had the probable cause necessary to issue the arrest warrant because in that statement the defendant confessed and admitted his responsibility for the robbery and murders.
"A 'bare-bones' affidavit can be validated if it is supplemented with additional facts which the magistrate considered before determining that probable cause was present."Crittenden, 476 So.2d at 634; Davis v. State, 500 So.2d 472
(Ala.Cr.App. 1986); Swain v. State, 504 So.2d 347, 351-53
(Ala.Cr.App. 1986). "Response to police questioning, then, frequently is an ingredient in the probable cause determination." W. LaFave, 2 Search and Seizure § 3.6(f) at 65 (2d ed. 1987). See also State v. Hanson, 480 So.2d 620, 624
(Ala.Cr.App. 1985) (statements given during a period of illegal detention may not be used to establish probable cause for an arrest); Johnson v. State, 455 So.2d 152, 156-57
(Ala.Cr.App. 1984). Therefore, we find that the additional information supplied the magistrate was sufficient to cure the defective "bare-bones" affidavit.
 B.
From the record before us, it is difficult to determine exactly when the defendant was taken into actual custody. The evidence, even though conflicting, is sufficient to justify a finding that the defendant consented to go with the investigators for questioning.
 "The Fourth Amendment does not involve consensual conduct. 'Dunaway [v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)], of course, does not change the rule that a voluntary trip to the police station for questioning does not implicate the fourth amendment.' United States v. Webster, 750 F.2d 307, 321 (5th Cir. 1984), cert. denied, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985). One 'category of police-citizen encounter is that in which no restraint of the liberty of the citizen is implicated, but the voluntary cooperation of the citizen is elicited through noncoercive questioning; this type of contact does not rise to the level of a seizure.' [U.S. v.] Black, 675 F.2d [129] at 133 (7th Cir. 1982). See also United States v. Puglisi, 723 F.2d 779, 783 (11th Cir. 1984)." Cox v. State, 489 So.2d 612, 618-19 (Ala.Cr.App. 1985). *Page 136 
See also Waldrop v. State, 462 So.2d 1021, 1028
(Ala.Cr.App. 1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3483,87 L.Ed.2d 618 (1985); Johnson v. State, 453 So.2d 1323, 1325
(Ala.Cr.App. 1984).
The rule of Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371,63 L.Ed.2d 639 (1980), is that the police may not make a warrantless, nonconsensual entry into a suspect's home to effect a routine felony arrest. "[N]o person may be arrested in his home without a warrant unless both probable cause and exigent circumstances exist." United States v. Davis,785 F.2d 610, 615 (8th Cir. 1986). "A warrantless, nonconsensual entry into a suspect's home to make a routine felony arrest is presumed to be unreasonable." United States v. Edmondson,791 F.2d 1512, 1514 (11th Cir. 1986). When the sheriff's investigators went to the defendant's residence they had probable cause to arrest him because they had reliable evidence that he had been in possession of the actual murder weapon "a day or so" before the murders were committed. Additionally, we find that the investigators were lawfully in the defendant's residence. See Jarrell v. Balkcom, 735 F.2d 1242, 1249-50 (11th Cir. 1984), cert. denied, 471 U.S. 1103, 105 S.Ct. 2331,85 L.Ed.2d 848 (1985); Fisher v. State, 468 N.E.2d 1365, 1368
(Ind. 1984); State v. Hein, 138 Ariz. 360, 674 P.2d 1358, 1362
(1983).
"A suspect does not consent to being arrested within his residence when his consent to the entry into his residence is prompted by a show of official authority." Edmondson, 791 F.2d at 1515 (Arrest illegal where FBI agents, with weapons drawn, knocked and "yelled, 'FBI. Open the door.' "). "[C]onsent cannot be presumed from the absence of proof that a person resisted police authority of proof that the person merely acquiesced. Bumper v. North Carolina, 391 U.S. 543, 548-49,88 S.Ct. 1788, 1791-92, 20 L.Ed.2d 797 (1968)." Patzner v.Burkett, 779 F.2d 1363, 1369 (8th Cir. 1985). See alsoSchneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041,36 L.Ed.2d 854 (1973). "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by no more than acquiescence to a claim of lawful authority." Bumper,391 U.S. at 548-49, 88 S.Ct. at 1792.
 "Whether consent to entry was given voluntarily is a question of fact to be determined from the totality of the circumstances. . . . No one factor is controlling on the question of voluntariness; . . . which is normally to be decided by the trial court based on the evidence and the reasonable inferences drawn from that evidence. . . . The determination to be made is whether the will of the consenting individual was overborne, or whether the consent was his unconstrained choice. . . . The State must establish that the consent was voluntary and not the product of coercion or acquiescence to a claim of lawful authority." State v. Cobbs, 7 Conn. App. 656, 510 A.2d 213, 215
(1986) (citations omitted).
Here, the only implied or explicit evidence of coercion exhibited before the defendant indicated he would accompany the investigators is the presence of four investigators. " 'The presence of a number of officers tends to suggest an undertaking which is not entirely dependent on the consent and cooperation of the suspect.' " Edmondson, 791 F.2d at 1515. However, Chief Carter only asked to "see" and "talk" to the defendant. He did not request to be admitted into the house. There is substantial evidence that, after agreeing to accompany the investigators, the defendant voluntarily waived his Miranda
rights. The fact that the defendant initially gave the investigator so much false information tends to indicate that he had "decided to adopt a cooperative posture in the mistaken belief that he could thereby divert or prevent police suspicion of him." 3 LaFave § 8.2(g) at 204. The evidence that the defendant was given the Miranda warnings as they left his residence is significant because it indicates that the investigators were "prepared to recognize" the defendant's choice to assert his constitutional rights. 3 LaFave § 8.2(i) at 214. *Page 137 
Even if the evidence of the defendant's consent to accompany the investigators was found to be insufficient, the rule ofPayton was not violated because the defendant's brother
consented to the officers' entry.
 "Warrantless arrest in the accused's home is not permissible absent exigent circumstances or consent to enter. Payton v. New York, 445 U.S. 573, 576, 100 S.Ct. 1371, 1374, 63 L.Ed.2d 639 (1980). '[T]he consent of one who possesses common authority over the premises . . . is valid as against the absent, nonconsenting person with whom the authority is shared.' United States v. Matlock, 415 U.S. 164, 170, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). We have previously held that the third party consent must be voluntarily given to be valid and binding against the accused. E.g., United States v. Patterson, 554 F.2d 852, 854 (8th Cir. 1977) (per curiam). Whether the consent is truly voluntary is to be determined by the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)." United States v. Purham, 725 F.2d 450, 455 (8th Cir. 1984).
See also People v. Gary, 150 Mich. App. 446, 387 N.W.2d 877
(1986); In re Anthony F., 293 Md. 146, 442 A.2d 975, 977-79
(1982). "The consent necessary in Payton context is consent to enter, not consent to arrest." United States v. Briley,726 F.2d 1301 (8th Cir. 1984). State v. Howard, 373 N.W.2d 596, 599
(Minn. 1985).
For these reasons, we find that the detention of the defendant was legal and that his confessions were not the product of any unlawful arrest.
 II
The defendant argues that the State was improperly allowed to impeach its own witness by showing that part of her testimony was unreliable due to her emotional state at the time she observed the events about which she testified.
Tracy Wood testified that she and her date, Michael Guest, stopped at the Guest Service Station and Michael went inside to get a Coke. When he returned he indicated to Tracy that some people were inside causing trouble and sent Tracy to get his father, who operated the service station and whose residence was some seventy-five feet from the station. After Tracy arrived at the Guest residence, she heard shots and ran back to the station. She testified that when she returned it was "just — like walking into another world. I saw bodies laying everywhere." Tracy testified to the effect that there was a silver-colored truck at the service station when the murders occurred and that there was more than one person in the station causing trouble, which tended to support the defendant's defense that someone else committed the murders. Sheriff's Investigator Grant testified that his investigation showed that a silver-colored truck pulled into the station after the shootings. Other evidence indicated that only one person, the defendant, committed the crime.
The evidence showed that Tracy went into shock and became hysterical after discovering the bodies. Investigator Grant testified that she "was real upset, hysterical. At one time shortly after we arrived she was walking around holding a teddy bear, and continued to do so throughout the night." Grant also testified that "there were other things that [led] us to believe that the statements Tracy made were not exactly how she said they were" and that he questioned her reliability "from the very beginning." Grant summarized his testimony by stating, "I'm not saying that she was wrong, I'm just saying that she had the people in the right place, but she just had it wrong as to what sequence it was in, who was in the station at one time, when they came out, when they went back in. It fell into place with the evidence we have but in a different sequence than what she said."
We find that the prosecution did not violate the general rule traditionally applied by the courts of this state that a party may not impeach his own witness. C. Gamble, McElroy's AlabamaEvidence § 165.01(6) (3d ed. 1977). "While one is precluded under the general rule from impeaching *Page 138 
his own witness, he is not precluded from contradicting the testimony of his own witness." McElroy § 165.01(9) at 348. See also Williams v. Schaeffer, 262 Ala. 636, 639, 80 So.2d 722
(1955). "A party may always correct or contradict the testimony of his own witness, regardless of the restrictions or limitations as to his impeachment of such witness, and such contradiction may be made without a foundation therefor or a showing of surprise. The testimony of one witness contradicting another is not an impeachment of the witness so contradicted."Bell v. State, 466 So.2d 167, 173 (Ala.Cr.App. 1985) (citations omitted). "A party calling a witness is not absolutely bound by his statements, and while he may not impeach his witness, he may show the statements made by him are not true in fact, although this may incidentally discredit the witness." Oates v.Glover, 228 Ala. 656, 658, 154 So. 786 (1934); Gamble v.State, 417 So.2d 616 (Ala.Cr.App. 1982) (state could present direct conflicting evidence by its two expert witnesses on whether bullet wounds were entrance or exit wounds). It is competent for a party to show that his witness was mistaken in reference to a matter unfavorable to him, and to elicit from that witness the extent or character of his recollection.Feibelman v. Manchester Fire Assur. Co., 108 Ala. 180,19 So. 540, 547 (1896). "The trial court may, at any time before the evidence closes, permit a witness to correct, explain, or limit his previously given testimony, or to rebut the effect of the testimony of one of his own witnesses, although he thereby contradicts his own previous testimony." McLendon v. Grice,119 Ala. 513, 24 So. 846, 847 (1898).
 "It is hornbook law that when a party offers a witness in proof of his cause, he thereby, in general, represents him as worthy of belief, and cannot afterwards impeach his general character for truth or impugn his credibility by general evidence tending to show him to be unworthy of belief; but it is exceedingly clear that the party is not precluded from proving the truth of any particular fact, by other competent testimony, in direct contradiction of his witness, though the collateral effect may be to show that the witness was generally unworthy of belief." Jebeles Colias Confectionery Co. v. Booze, 181 Ala. 456, 62 So. 12, 14 (1913).
The reason for this rule is stated in 81 Am.Jur.2dWitnesses, § 625 (1976):
 "There is no rule which prevents a party from showing, by other witnesses, that his witness was mistaken as to a particular fact. Indeed, were a party forbidden to contradict his own witnesses, everyone would be at the mercy of his own witnesses, and if the first witness sworn should swear against him he would lose the testimony of all the rest, which would be a perversion of justice."
We find no abuse of the trial court's discretion in this matter.
 III
The defendant argues that the trial court erred in refusing to grant continuances of both the guilt-finding phase of the trial and the sentence hearing phase before the jury. We find no abuse of discretion.
The guidelines for determining whether a trial court has abused its discretion in denying a continuance are set out inEx parte Saranthus, 501 So.2d 1256, 1257 (Ala. 1986):
 "A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973). If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence. Knowles v. Blue, 209 Ala. 27, 32, 95 So. 481, 485-86 (1923)."
 A.
The defendant's trial began on Monday, February 10, 1986. On the previous Friday, *Page 139 
the prosecution disclosed to the defendant two documents containing hearsay information contained in the file of the Sheriff's Office that two other people had allegedly confessed to the shootings. One document was a report by the Maui Police Department, Hawaii. While this report is not contained in the record, the prosecutor described its contents: "[O]ne was a fellow who used to get drunk in Hawaii and would say I killed somebody. And then, when he was drunk he would say, 'Well, I didn't kill them, but I attempted to.' And on his personal effects were found newspaper clippings relative to the Guest Service Station." This individual did not admit that he was responsible for the Guest murders.
The second document was a report on an individual named Fulmer from Vincent, Alabama, who allegedly told someone he committed the Guest killings. However, when interviewed, Fulmer "denied doing it." The prosecution represented to the defendant and the trial court that this information had been investigated and "turned out not to be true."
The trial court denied the requested continuance after examining the two documents to "see if [they] contain exculpatory matter." Neither document is a part of the record on appeal. The trial court also found that "[t]he police investigated those statements made by those people, as they were investigating all possible leads at that time."
At trial, defense counsel cross-examined Investigator Grant about these two individuals. There was no motion for a new trial. On appeal, it is alleged that "counsel was not afforded sufficient time to investigate the additional evidence, and prepare a defensive strategy based thereon." Appellant's brief, p. 36.
Applying the principles of the capital case of Ex parte Hays,518 So.2d 768 (Ala. 1986), we find it extremely improbable that the additional time for preparation requested by the defendant would have changed the result of the trial and that the defendant has not met his burden of showing actual prejudice in the defense of the charge for which he was convicted. In Hays, our Supreme Court wrote:
 "Hays contends that the trial court's denial of his motion for continuance, under the facts of this case, denied him his constitutional right to effective assistance of counsel under the Sixth Amendment of the United States Constitution. The Court of Criminal Appeals rejected this argument because Hays failed to show any actual prejudice in the defense of his case as a result of the trial court's denial of his motion. We agree.
 "The United States Supreme Court in Morris v. Slappy, 461 U.S. 1, 11-12, 75 L.Ed.2d 610, 619, 103 S.Ct. 1610, 1616 (1983), recognized that:
 "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel. See Chambers v. Maroney, 399 U.S. 42, 53-54, 90 S.Ct. 1975, 1982-1983, 26 L.Ed.2d 419
(1970). Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel. Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921
(1964).
 "See also, Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); Connor v. State, 447 So.2d 860 (Ala.Cr.App. 1984). Furthermore, it is evident from recent Supreme Court precedent that, although certain criteria such as the time provided for the investigation and preparation of the case, counsel's experience, the gravity of the charge and complexity of defenses, and counsel's accessibility to witnesses are relevant factors to consider when evaluating effectiveness *Page 140 
of counsel, the controlling analysis is whether the action prejudiced the accused in the defense of his or her case. See United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657
(1984). The accused has the burden of proving prejudice by making a showing that he or she did not receive 'a fair trial, a trial whose result is reliable.' Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). As opined in United States v. Cronic, supra:
 "The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted — even if defense counsel may have made demonstrable errors — the kind of testing envisioned by the Sixth Amendment has occurred.
 "466 U.S. at 656, 104 S.Ct. at 2045, 80 L.Ed.2d at 666." Hays, supra, 518 So.2d at 771-72.
 B.
After the jury returned its verdict of guilty at 6:01 on the evening of Saturday, February 15, 1986, the trial court explained the sentencing phase of the trial to the jury and the alternative times when this hearing could be held. He sent the jury into the jury room to consider the alternatives. He later polled the jury, which indicated that it wished to begin the sentencing hearing immediately. Then, defense counsel requested a continuance until Monday: "[W]e feel that it would be best for all concerned, of course, for the defendant, but everybody concerned, to wait until Monday to resume the sentence hearing when everyone is rested, and particularly for the defense, that we feel that we will be much better able to present our position for mitigation at that point."
The trial court denied this request: "[T]hey [the jury] appear to be fresh, and they want to proceed, and I'm going to go ahead and defer to their wishes and begin the sentencing phase of these proceedings." Later, defense counsel renewed the motion for a continuance adding the ground that they had "not had sufficient time to prepare any evidence or argument for this phase of the trial."
At the sentencing phase before the jury, the State called no witnesses. The defendant's father testified on the defendant's behalf. Arguments were presented and the jury was instructed. After deliberating for fifty-seven minutes, the jury returned a unanimous verdict recommending the defendant be punished by death.
The sentencing hearing before the trial court was held on March 4, 1986. There was no additional mitigating evidence presented.
Applying the principles of Saranthus, supra, and Hays, supra, we find that the trial court did not abuse its discretion in denying the request to continue the sentencing hearing.
 IV
The jury venire was composed of seventy-six persons. The jury was divided into six panels for the voir dire. All but two jurors indicated that they had read or heard of the case in the media.
The defendant challenged six jurors for cause on the basis of their fixed opinions of his guilt based on pretrial publicity. All six challenges were granted. We agree with the trial court's specific finding that it "allowed a full and fair and sifting and exhausting voir dire in this case."
After reviewing the evidence of the pretrial media publicity, the trial court found that "[t]here has been extensive coverage of this case, both before this investigation, or charges were focused on this defendant, and since he has been charged. Of course, there was extensive coverage of the escape in this case."
The controlling principles on this issue are set out inEx parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied,Grayson v. Alabama, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157
(1985):
 "Absent a showing of abuse of discretion, a trial court's ruling on a motion for *Page 141 
change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355
(1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala.Crim.App. 1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298
(Ala.Crim.App. 1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
 " 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. . . .'
 "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, '[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299
(Ala.Crim.App. 1978)."
The defendant argues that nineteen of the 76 jurors "stated that at some point in time prior to the trial, they felt that the Defendant was guilty, or that they had negative feelings toward him." Appellant's brief, p. 39. However, the fact that even a majority of the prospective jurors had preconceived notions of the guilt of the accused does not require a change of venue where there is evidence that the jurors would be able to lay aside their impressions or opinions and render a verdict based on the evidence presented in court. Callahan v. State,471 So.2d 447, 452 (Ala.Cr.App. 1983), reversed on other grounds, Ex parte Callahan, 471 So.2d 463 (Ala. 1985). "The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035,104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).
The trial court's findings of impartiality should be overturned only for "manifest error." Irvin v. Dowd,366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961).
We find that the following comments of the court inPatton v. Yount, supra, are applicable here:
 "In short, the record of publicity in the months preceding, and at the time of, the . . . trial does not reveal the 'barrage of inflammatory publicity immediately prior to trial,' Murphy v. Florida, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975), amounting to a 'huge . . . wave of public passion,' Irvin, supra, 366 U.S. at 728, 81 S.Ct. at 1645, that the Court found in Irvin. . . .
 ". . . In addition, while it is true that a number of jurors and veniremen testified that at one time they had held opinions, for many, time had weakened or eliminated any conviction they had had. . . .
 ". . . Not all members of the venire had put aside earlier prejudice, as the voir dire disclosed. They retained their fixed opinions, and were disqualified. But the testimony suggests that the voir dire resulted in selecting those who had forgotten or would need to be persuaded again." 467 U.S. at 1032-34, 104 S.Ct. at 2889-90.
Our review convinces us that there is nothing in the record to suggest that the jurors could not or did not render a verdict based solely on the evidence presented at trial. It has not been shown that the trial court abused its discretion in denying the motion for change of venue. *Page 142 
 V
The defendant complains that the trial court committed reversible error in admitting into evidence certain items of tangible evidence because the defendant had not been previously shown these items under a pretrial order of discovery. The items of evidence were a diagram of the crime scene, two autopsy photographs showing the exit wound in the chest of Nancy Payne, an autopsy photograph showing the exit wound in the chest of Wilbur Nelson, and two packages of cigarettes taken from the pocket of Bobby Payne through which the bullet passed before entering his chest.
Assuming that the prosecution did violate the trial court's pretrial discovery order, we find no error in the trial court's admission of these items into evidence.
A trial court may enter any order it "deems just under the circumstances" whenever it learns that a party has failed to comply with its discovery order. Rule 18.5(a), A.R.Cr.P. (Temp.). Although Rule 18.5(a) provides that a trial court may prohibit the noncomplying party from introducing evidence not disclosed, this is an alternative remedy and is not mandatory. "The imposition of sanctions upon noncompliance with a court's discovery order is within the sound discretion of the court."McCrory v. State, 505 So.2d 1272, 1279 (Ala.Cr.App. 1986).
Here, the Attorney General accurately notes that "none of the evidence was exculpatory; none of it was material to the preparation of the defense; and all of it was cumulative of other evidence." Appellee's brief, p. 40. We also note that the existence of the bullet wounds and the cigarette packages was disclosed in the autopsy report which had been made available to the defendant pursuant to the discovery order.
The evidence would not have affected the outcome of the trial and the defendant has not demonstrated any prejudice. Therefore, we find no abuse of the court's discretion in the admission of the items into evidence. Barrow v. State,494 So.2d 834, 836 (Ala.Cr.App. 1986). Compare Ex parte Geeslin,505 So.2d 1246 (Ala. 1986), cert. denied, 481 U.S. 1037,107 S.Ct. 1974, 95 L.Ed.2d 814 (1987); Ex parte Watkins, 509 So.2d 1064
(Ala. 1984).
 VI
The defendant claims that the trial court erred in finding as an aggravating circumstance the fact that the capital offense was committed while the defendant was engaged in the commission of a robbery, defined by Alabama Code 1975, § 13A-5-49(4), because the defendant was indicted for robbery-murder pursuant to § 13A-5-40(a)(2). Section 13A-5-50 provides, "The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in § 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence." This practice does not result in double punishment for the same offense. Ex parteKennedy, 472 So.2d 1106, 1108 (Ala.), cert. denied, Kennedy v.Alabama, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy. State v. Flowers,441 So.2d 707, 717 (La. 1983), cert. denied, Flowers v. Louisiana,466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984).
 VII
The defendant argues that the written order of the trial court imposing the sentence of death does not satisfy the requirements of § 13A-5-47(d) that "the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in section 13A-5-49, each mitigating circumstance enumerated in section 13A-5-51, and any additional mitigating circumstances offered pursuant to section 13A-5-52." *Page 143 
The relevant portion of the trial court's order states:
 "From the evidence presented at the trial and at the sentence hearing and from a review of the pre-sentence investigation report, the Court finds that the Defendant, Tommy J. Fortenberry, did intentionally murder two or more persons, being Wilbur T. Nelson, Ronald Michael Guest, Robert William Payne, and Nancy Payne, by one act or pursuant to one scheme or course of conduct. Title 13A-5-40(10), Code of Alabama, 1975 as amended. The Court further finds that the Defendant, Tommy J. Fortenberry, did intentionally murder Wilbur T. Nelson during a robbery in the first degree, Title 13A-5-40(2), Code of Alabama, 1975 as amended. The Court further finds as a statutory aggravating circumstance, that the intentional murder was committed while the Defendant was engaged in the commission of a robbery in the first degree.
 "The Court in considering and weighing mitigating circumstances, finds that the Defendant has no significant history of prior criminal activity, having only one (1) prior conviction for Burglary third degree. The Court finds no evidence that the Defendant was acting under the influence of extreme mental or emotional disturbance or that he lacked the capacity to appreciate the criminality of his conduct or to conform to the requirements of law. The Court further finds no evidence that the victims participated in the Defendant's conduct or consented to it or that the Defendant was an accomplice to another who committed the offense and that his participation was relatively minor. The Court further finds no evidence that the Defendant acted under duress or under the substantial domination of another person.
 "The age of the Defendant at the time of the commission of the crime was twenty (20) years of age and the Court determines that this is a mitigating circumstance to be considered and weighed. In addition to consideration of the statutory mitigating circumstances, the Court finds that the Defendant has studied for and become licensed as a practical nurse. The Court specifically determines the Defendant's training and licensing as a nurse is a mitigating circumstance which is herein considered and weighed.
 "The Court finds from a consideration of the evidence taken on the trial of the case and at the sentencing hearing that the aggravating circumstance listed in Section 13A-5-49(4) exists in this case and is sufficient to support the sentence of death. It is the opinion of the Court that the mitigating circumstances heretofore enumerated are insufficient to outweigh the aggravating circumstance. The Court therefore, finds that the punishment of this Defendant should be fixed by the Court at death."
As the Attorney General concedes, this sentencing order is defective and does not comply with the literal requirements of § 13A-5-47(d).
The trial court did not enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49. Instead, the trial court specifically found the existence of only one aggravating circumstance: § 13A-5-49(4) "The capital offense was committed while the defendant was engaged in the commission of, . . . robbery."
In its written order, the trial court specifically considered the existence or nonexistence of each mitigating circumstance enumerated in § 13A-5-51. The trial court found two statutory mitigating circumstances to exist: (1) "The defendant has no significant history of prior criminal activity." § 13A-5-51(1); and (2) "The age of the defendant at the time of the crime." §13A-5-51(7). The trial court also found the existence of one nonstatutory mitigating circumstance: "the Defendant's training and licensing as a nurse."
In weighing the aggravating and mitigating circumstances, the trial court found "that the aggravating circumstance . . . is sufficient to support the sentence of death. It is the opinion of the Court that the mitigating circumstances heretofore *Page 144 
enumerated are insufficient to outweigh the aggravating circumstance." This portion of the court's written order is also technically defective. The determination the sentencing court must make is "whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist." § 13A-5-47(d).
While the trial court's sentencing order is defective, the errors are not so egregious or substantial as to require a new sentencing order. "The sole purpose of requiring that the trial judge, as the sentencing authority, make a written finding of the aggravating circumstance is to provide for appellate review of the sentence of death." Ex parte Kyzer, 399 So.2d 330, 338
(Ala. 1981). "[T]he harmless error rule does apply in capital cases at the sentence hearing." Ex parte Whisenhant,482 So.2d 1241, 1244 (Ala. 1983). "As long as the trial judge properly exercises his discretion and the facts indicating the death penalty are 'so clear and convincing that virtually no reasonable person could differ,' a harmless error analysis can be used." Baldwin v. State, 456 So.2d 117, 126
(Ala.Cr.App. 1983), affirmed, Ex parte Baldwin, 456 So.2d 129,140 (Ala. 1984). See also Barclay v. Florida, 463 U.S. 939,103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); Thompson v. State,503 So.2d 871, 881 (Ala.Cr.App. 1986), affirmed, Ex parte Thompson,503 So.2d 887 (Ala.), cert. denied, Thompson v. Alabama, ___ U.S. ___, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987). We emphasize that "the safer practice would have been for the trial judge to simply follow the verbiage of the statute in negating aggravating circumstances." Berard v. State, 402 So.2d 1044,1051 (Ala.Cr.App. 1980).
Here, there is nothing to indicate that the trial court refused or failed to consider any aggravating or mitigating circumstance. Compare Ex parte Cochran, 500 So.2d 1179, 1187
(Ala. 1985) ("The trial judge's order does not state whether heconsidered the evidence offered by the defendant and then
determined that it was insufficient or whether he merely precluded it without consideration."); Clisby v. State,456 So.2d 99, 102 (Ala.Cr.App. 1983) ("[W]e cannot make the assumption that the trial judge's finding of no mitigating circumstances is 'tantamount to a holding that the degree of disability necessary to support those (statutory) mitigating circumstances was lacking.' "). There was no discrepancy between the trial court's oral sentence findings and its written sentence order. Giles v. State [Ms. 6 Div. 86, January 10, 1984], (Ala.Cr.App. 1984), on return from remand, [January 22, 1985], extended on denial of rehearing [December 9, 1986].
At the sentencing hearing, the prosecution argued that only two aggravating circumstances were applicable: (1) §13A-5-49(4), "The capital offense was committed while the defendant was engaged . . . in the commission of, . . . robbery"; and (2) § 13A-5-49(8), "The capital offense was especially heinous, atrocious or cruel compared to other capital offenses." However, the prosecution urged the trial court to consider only subsection (4). In its order, the trial court found the existence of that aggravating circumstance "sufficient to support the sentence of death."
The trial judge did not engage in presumptive sentencing. He did not find the existence of one aggravating circumstance and presume death to be the proper sentence unless overcome by sufficient mitigating circumstances. Cochran v. State,500 So.2d 1161, 1177-78 (Ala.Cr.App. 1984), affirmed in part, reversed in part, Ex parte Cochran, 500 So.2d 1179 (Ala. 1985), cert. denied, Cochran v. Alabama, 481 U.S. 1033,107 S.Ct. 1965, 95 L.Ed.2d 537 (1987). Instead, the trial court concluded that the presence of the aggravating circumstance found to exist was sufficient to warrant the death penalty, and further concluded that the mitigating circumstances did not outweigh that aggravating circumstance.
Engaging in an independent weighing and balancing of the aggravating and mitigating circumstances in this case, we have no difficulty in concluding that the facts indicating the death penalty are so clear and convincing that virtually no reasonable person could differ. The "technical errors" *Page 145 
in the trial court's sentencing order were errors without any injury to the defendant. Giles, supra.
We note that at the jury portion of the sentencing phase, the trial court properly instructed the jury on the proper method of weighing the aggravating and mitigating circumstances. More significantly, the trial judge explained the procedure to counsel:
 "THE COURT: No, sir, let me say this. One aggravating circumstance may outweigh several mitigating, but it doesn't say it will. It's not a weighted test in favor of the aggravating circumstances. There may be a mitigating circumstance that will outweight four aggravating circumstances. So, it's not a numerical thing and nothing has any weight.
 "By virtue of this being an aggravating circumstance does not necessarily mean that they must find death, it just means that they have got — if they do find this, then, they must consider this, they can't rule out death, they can't just show that it automatically recommends the other."
Our review of the trial court's order and the record of the sentencing hearings convinces us that the trial court properly considered and weighed the aggravating and mitigating circumstances in imposing the sentence of death.
 VIII
Undertaking the statutory command of § 13A-5-53, we have no difficulty in upholding the propriety of the death sentence in this case. We have searched for and found no error adversely affecting the right of the defendant in the trial and sentence proceedings. The trial court's findings concerning aggravating and mitigating circumstances are supported by the evidence.
There is absolutely no evidence whatsoever that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. The jury was specifically instructed to avoid such influences and, in the absence of any evidence to the contrary, we may assume that both the trial judge and the jury followed those instructions. Ex parteHarrell, 470 So.2d 1309, 1318 (Ala. 1985); Kennedy v. State,472 So.2d 1092, 1105 (Ala.Cr.App. 1984), affirmed, Ex parte Kennedy,472 So.2d 1106 (Ala.), cert. denied, Kennedy v. Alabama,474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. The sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. See Hill v. State, 455 So.2d 930 (Ala.Cr.App.), affirmed, Ex parte Hill, 455 So.2d 938 (Ala.), cert. denied,Hill v. Alabama, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716
(1984), each involving the capital murder of three persons.
The judgments of the circuit court convicting the defendant and sentencing him to death are affirmed.
AFFIRMED.
All the Judges concur.