McMILLAN, Retired Appellate Judge.
 

 The appellant, Vernon Lamar Yancey, was convicted of murdering Mattie “PeeWee” Sports during a robbery of Tyler’s Grocery Store, in violation of § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 7 to 5, recommended that Yancey be sentenced to life imprisonment without the possibility of parole. Thereafter, a sentencing hearing was held before the trial court, and the trial judge overrode the jury’s advisory verdict and sentenced Yancey to death. This appeal followed. § 13A-5-53(a), Ala.Code 1975.
 
 [1]
 

 The State’s evidence tended to show that on March 23, 1995, Mattie “Pee-Wee” Sports was shot and killed with a sawed-off shotgun in Tyler’s Grocery Store where she worked as a cashier. On the night of the murder, at approximately 10:30 p.m., Sports and Lisa Navas, Sports’s daughter-in-law, were working at Tyler’s store when a customer entered. Approximately 10 minutes later, as the customer was leaving the parking lot of the store, he witnessed Yancey walking in the direction of the store and then turn away from the store. He was wearing only blue jeans; he was not wearing a shirt. Approximately five minutes after the customer left the store, a man wearing an orange ski mask and gloves and carrying a sawed-off shotgun, which was concealed by a raincoat entered the store. He walked directly toward Sports, pointed the shotgun at her, and fired it once, shooting her in the face from
 
 *457
 
 close range. She was killed instantly. Navas attempted to run to the bathroom and lock the door, but the man chased her and prevented her from doing so. He demanded money from her, and Navas gave him money from one of the cash registers,
 
 [2]
 
 as well as money that was kept inside a Benson and Hedges brand carton of cigarettes. The man appeared to know that there was more money in the store than what was in the cash register. The owner of the store later testified that approximately $1,500 was taken during the robbery. As Navas knelt down to obtain the money, she looked up and recognized the man as a frequent customer of the store, because the ski mask was loose and did not completely cover his face. She testified that she recognized his eyes and that she could clearly see his face. She stated that she then averted her eyes because she feared that he would realize that she had recognized him. The man took the money and ran from the store. Navas, who was then lying on the floor by the victim, pushed a silent alarm button and called emergency 911 and waited for the police. She described the robber as wearing blue jeans but no shirt. She further informed the police that the store operated a security videotape, which was located in the owner’s office and which filmed the store at all times from behind the counter. The police telephoned the owner of the store and asked to view the security tape. The owner recognized the robber as a frequent customer and, although he could not recall his name, told the police that he worked for Rusco Plumbing, a business located close to the store. He stated that he knew of this employment because he often cashed payroll checks for the man. The owner stated that the man was easily identifiable because of his walk, which resembled that of a penguin. The police were subsequently able to identify Yancey after speaking with his employer. It was determined that Yancey lived on Rise Road, which was located very near the store and, in the course of searching the area surrounding the store following the crime, officers traveled down a path that lead to Rise Road. In doing so, they recovered an orange ski mask, which was subsequently identified by Yancey’s coworkers as belonging to him; paper straps containing money and loose dollar bills; unspent shotgun shells; a green raincoat; an empty Benson and Hedges brand cigarette carton; and a pair of gloves with the word “Buck” written on them. Yancey’s coworkers also testified that they had seen him with these gloves before the murder, and the owner of the gloves identified them and stated that he had lost them on a job site where Yancey was also working. Under an abandoned house close to Yan-cey’s home, officers found shotgun shells and a shotgun with a sawed-off barrel which was later determined to have fired the spent shotgun shell through the right barrel. A witness who also had lived on Rise Road close to Yancey’s house testified that the shotgun had belonged to him and that it had been stolen from his house. He testified that, when he heard of the offense, he checked to see if the shotgun was missing and determined that it was gone. Another witness testified that he had recently loaned Yancey his hacksaw, which Yancey had returned to him a few days before the murder.
 

 Yancey was arrested at his house; he had to be subdued with the use of pepper spray. A police officer testified that he noticed a bruise on Yancey’s torso at the level of his bicep; an expert witness for the State testified that such a bruise might
 
 *458
 
 be consistent with an injury caused from firing a sawed-off shotgun. A hair sample was taken from Yancey to compare with hairs found inside the ski mask, and they were determined to be consistent with Yancey’s hair.
 

 Yancey did not testify during the guilt phase at trial. However, the defense presented the testimony of Yancey’s mother, who stated that Yancey was at home at the time of the offense.
 

 Because Yancey has been sentenced to death, this court must review the proceedings below for plain error, despite the lack of any objection. Rule 45A, Ala. R.App. P., states:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 Moreover, this court has addressed the plain-error standard of review as follows:
 

 “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in
 
 United States v. Young,
 
 470 U.S., 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See
 
 Ex parte Price,
 
 725 So.2d 1063 (Ala.1998), cert, denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999);
 
 Burgess v. State,
 
 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999);
 
 Johnson v. State,
 
 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
 

 Hall v. State,
 
 820 So.2d 113, 121-22 (Ala. Crim.App.1999), aff'd, 820 So.2d 152 (Ala. 2001). Although Yancey’s failure to object will not preclude this court from reviewing any issue, it will weigh against any claim of prejudice. See
 
 Dill v. State,
 
 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).
 

 I.
 

 Yancey argues that the trial court’s denial of his request for funds to hire an expert witness to analyze certain scientific evidence denied him a fair trial and constituted reversible error. Specifically, Yan-cey argues that he could not receive a fair trial without expert scientific testimony that could show him to have not been at the scene of the mui'der and not to have been connected by circumstantial evidence, specifically experts in such evidence as ballistics, DNA, and scientific-comparison evidence. Yancey reasons that because the State chose to rely heavily on eyewitness testimony rather than the circumstantial scientific evidence that corroborates the eyewitness testimony, his best defense would have been to negate the circumstantial evidence that supports the eyewitness testimony. Therefore, Yancey argues that, because he was denied funds to hire such experts, he was deprived of his right to present an adequate defense and, thus, denied his right to a fair trial. The State responded that, at the pretrial hearing on Yancey’s motion for funding for experts, he raised his argument concerning the
 
 *459
 
 need for expert testimony only for an expert on ballistics and blood-splatter evidence to test his raincoat for the existence of blood or gunpowder residue in order to prove that he was not the man who fired the shotgun.
 
 [3]
 
 At the hearing, defense counsel had argued that if the shotgun had been wrapped inside the raincoat, gunpowder residue should have been present on the coat as well as possibly blood splatter. The trial court had responded that because the raincoat had already been tested by a State’s expert, the testimony of another expert would have been merely cumulative. Defense counsel had responded that he preferred to have the analysis of his own expert. The trial court had then stated that, if Yancey examined the evidence and determined that there was a possible alternate conclusion, he could ask the court again for funds to hire an expert so long as he submitted an estimate for the cost of the expert and somehow contradicted the findings of the State’s expert. Thus, the State submits that because Yancey did not “show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial,”
 
 Ex parte Moody,
 
 684 So.2d 114, 119 (Ala.1996), he is not entitled to relief because he was not denied a fair trial. The State argues that there was no error by the trial court in denying this request because, it says, the evidence would have been cumulative to that of the State’s expert and would address an undisputed issue because no gunpowder was discovered on Yancey’s raincoat as established by the State’s witness. The record indicates that the State’s forensic-expert witness testified that not only was no gunpowder residue found on the raincoat, but also that such residue would not have been found on a raincoat worn by the shooter because of its close proximity to the gun.
 

 In his reply brief, Yancey responds to the State’s argument and again argues that the State provided insufficient scientific testing of the evidence in this case, which evidence, Yancey says, might have proved that he was not present at the offense. The only specific example given by Yancey, however, was that there was no DNA testing of the blood splatter on the garments and gloves.
 

 “ ‘In
 
 [Ex parte
 
 ]
 
 Moody,
 
 [684 So.2d 114 (Ala.1996),] the Alabama Supreme Court defined the standard by which a trial court must assess an indigent defendant’s request for expert assistance.
 

 “ ‘ “Although [the United States] Supreme Court has not specifically stated what ‘threshold showing’ must be made by the indigent defendant with the regard to the need for an expert, the Court refused to require the State to pay for certain experts when the indigent defendant ‘offered little more than undeveloped assertions that the requested assistance would be beneficial.’
 
 Caldwell v. Mississippi,
 
 472 U.S. 820 at 323, 105 S.Ct. 2633 at 2637, 86 L.Ed.2d 231 (1985). As we stated in
 
 Dubose [v. State,
 
 662 So.2d 1189 (Ala.1995) ] the Supreme Court cases of
 
 Ake [v. Oklahoma,
 
 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) ] and
 
 Caldwell,
 
 viewed together, seemed to hold that an indigent defendant must show more than a mere possibility that an expert would aid in his defense. ‘Rather, the defendant must show a
 
 *460
 
 reasonable probability that an expert would aid in his defense and [must show that] a denial of an expert to assist at trial would result in a fundamentally unfair trial.’
 
 Dubose,
 
 662 So.2d at 1192, citing
 
 Moore v. Kemp,
 
 809 F.2d 702 (11th Cir.), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).
 

 “ ‘ “Based on the foregoing, we conclude that for an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the degree of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the State or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense.”
 

 “ ‘684 So.2d at 119.
 
 See also Burgess v. State,
 
 [723] So.2d [742] (Ala.Cr.App. 1997);
 
 MacEwan v. State,
 
 701 So.2d 66 (Ala.Cr.App.1997);
 
 Ex parte Do-byne,
 
 672 So.2d 1354, 1357 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571,134 L.Ed.2d 670 (1996).’
 

 “Finch v. State,
 
 715 So.2d 906, 910-11 (Ala.Crim.App.1997).”
 

 McGowan v. State,
 
 990 So.2d 931, 953-54 (Ala.Crim.App.2003).
 

 The Alabama Supreme Court further stated in
 
 Ex parte Dobyne,
 
 672 So.2d 1354, 1357 (Ala.1995),
 

 “[A] defendant, in order to be entitled to funds to pay for an expert, must show more than a mere possibility that he or she will receive useful assistance from the expert. Rather, the defendant must show a reasonable probability that the expert would aid in the defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial. In the past, Alabama decisions have been based upon whether the defendant made an adequate showing of the need for the requested expert.
 
 Du-bose [v. State
 
 ], 662 So.2d [1189] at 1191 [ (Ala.1995) ]; see also,
 
 Smith v. State,
 
 623 So.2d 369 (Ala.Cr.App.1992), cert. denied, [510] U.S. [1030], 114 S.Ct. 650, 126 L.Ed.2d 607 (1993);
 
 McLeod v. State,
 
 581 So.2d 1144 (Ala.Cr.App.1990);
 
 Siebert v. State,
 
 562 So.2d 586 (Ala.Cr. App.1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990);
 
 Stewart v. State,
 
 562 So.2d 1365 (Ala.Cr.App.1989);
 
 McGahee v. State,
 
 554 So.2d 454 (Ala.Cr. App.), aff'd, 554 So.2d 473 (Ala.1989).”
 

 See also
 
 Belisle v. State,
 
 11 So.3d 256, 280 (Ala.Crim.App.2007);
 
 Smith v. State,
 
 [Ms. CR-97-1258, January 16, 2009] - So.3d -, - (Ala.Crim.App.2009);
 
 Beckworth v. State,
 
 946 So.2d 490, 503-504 (Ala.Crim.App.2005).
 

 Yancey failed to show a reasonable probability that independent experts would help his defense. Joseph Saloom, an expert on firearms from the Department of Forensic Sciences, testified that no gunpowder was discovered on Yancey’s raincoat or flannel shirt. Defense counsel argued this fact to the jury. Saloom testified, however, that because of the close proximity of the raincoat to the gun, it was unlikely that such residue would have been present as it would have passed directly through the shirt and deposited at a distance farther away. There was also testimony from Lt. Bryan McGarr, another State’s witness, that fingerprints had not been lifted off of the weapon or gloves. However, the State argued that fingerprints would not be present on the weapon
 
 *461
 
 because the perpetrator had used the gloves. The subject of DNA testings was addressed at trial concerning two hairs found on the ski mask recovered from the pathway between Tyler’s Grocery Store and Rise Road and compared to a known hair sample taken from Yancey. During the cross-examination of Assistant Chief of Police Terry Morris, of the Phenix City Police Department, who had been property and evidence custodian, defense counsel elicited testimony that at “that particular time, [Chief Morris] didn’t believe they were cheeking for DNA.” (R. 1513.) Two police officials for the State, Craig Bailey and Tellis Hudson, both testified that a DNA examination of the hairs found on the ski mask was impossible, because no skin tags were available on the hairs and only skin tags could provide DNA analyzation in 1997.
 
 [4]
 

 Although the trial court gave Yancey the opportunity to submit an estimate for the cost of procuring expert testimony and to provide some evidence or proffer that would support a claim that the State’s experts had not testified accurately, Yan-cey failed to do so. Yancey’s defense counsel was allowed to fully cross-examine the State’s experts and to make suggestions concerning the lack of certain evidence, such as the gunpowder residue and the lack of blood splatter on Yancey’s clothing. Yancey has failed to make a showing that any expert was necessary to answer a substantial issue or to support a critical element of the defense. Therefore, Yancey was not denied a fair trial on this ground, nor was there any plain error in not funding experts on matters not specifically enumerated by Yancey.
 
 McGowan v. State,
 
 supra at 954. Rule 45A, Ala. R.App. P.
 

 II.
 

 Yancey argues that three potential jurors should have been removed from the jury panel, one because he was not adequately qualified by the trial court and two others for cause.
 

 A.
 

 Yancey argues that potential juror E.K. gave notice to the trial court that he believed that he was a resident of Lee County, Alabama, rather than Russell County, where the trial was held. Thus, Yancey argues that the potential juror was not qualified and that the trial court erred in overruling his objection to this potential juror. He cites § 12-16-60, Ala.Code 1975, in support of his argument.
 

 Defense counsel never objected to the trial court’s qualifying of this potential juror or any of the questions asked of him at trial; therefore, this issue is to be reviewed under the plain-error standard. Rule 45A, Ala. RApp. P.
 

 The record indicates that the trial court previously qualified the venire and asked, in pertinent part, “Is each member of this jury a member of Russell County, and have you resided in Russell County for more than 12 months? Is there anyone who is not a resident of Russell County and has not resided in Russell County for more than 12 months?” (R. 128.) One potential juror indicated that she in fact did not live in Russell County; that potential juror was excused. Thereafter, during an interval between the questioning of potential juror panels, one of the defense counsel stated, “Judge, E.K., that address is in Lee County. [Address omitted], and that’s in Lee County, if that’s where he
 
 *462
 
 still lives.” The trial court responded that it would ask the potential juror “questions specifically about his residence when he comes back.” (R. 207.) The trial court thereafter questioned the potential juror concerning his residency. The following transpired during the voir dire examination of potential juror E.K.:
 

 “THE COURT: You have already been sworn in and will be testifying under oath to any questions. There is a possible question as to your residency, whether you’re a resident of Russell or Lee County. Have a seat. I am not going to make you stand in there. Your
 

 home address is at _, and that
 

 would be, to my knowledge, in Lee County, Alabama.
 

 “PJ: Well, I am not really sure because a couple of years ago — I get my tags here; my license in Phenix City, so I thought—
 

 “THE COURT: Are you registered to vote?
 

 “PJ: Yes.
 

 “THE COURT: In which county are you registered in?
 

 “PJ: Russell.
 

 “THE COURT: All right. And do you consider yourself a resident of Russell County?
 

 “PJ: Yes.
 

 “THE COURT: All right. And do you list that on your tax return as being a resident of Russell County?
 

 “PJ: Yes.
 

 “THE COURT: All right.”
 

 (R. 542-43.)
 

 In Alabama, the qualifications of jurors are established by § 12-16-60, Ala.Code 1975, which states:
 

 “(a) A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also:
 

 “(1) Is a citizen of the United States, has been a resident of the county for more than 12 months and is over the age of 19 years .... ”
 

 Moreover, the duty of the court to properly qualify a jury venire is established by Rule 12.1(c) Ala. R.Crim. P. which states as follows:
 

 “(c) Qualifying the venire. On the opening day of the term, or on such other day as the venire shall have been summoned to appear, the judge presiding shall proceed to organize the court, by:
 

 “(3) Inquiring of the jurors as to their qualifications in general, considering any excuse or postponement from service for the term, and excusing from service those jurors who are disqualified or who are entitled to be excused.”
 

 The trial court properly qualified the jury panel and thereafter determined that potential juror E.K. was a resident of Russell County, fulfilling his residency requirement in order to serve as a juror in the present case. The trial court ascertained that the potential juror received his tax returns as a resident of Russell County, was registered to vote in Russell County, received his license tags in Russell County, and considers himself to be a resident of Russell County. Although defense counsel had stated his belief that the address given by the potential juror was not in Russell County, there was no evidence to support this, and the address given by the potential juror’s responses negated this belief. See
 
 Fuller v. State,
 
 269 Ala. 312, 324, 113 So.2d 153, 163 (1959)(holding that if an appellant believes that a trial court’s conduct in questioning
 
 *463
 
 a venire resulted in prejudice, then it becomes incumbent upon the appellant to show the error; “[i]t cannot be presumed”). See also
 
 Greenwald v. State,
 
 579 So.2d 38 (Ala.Crim.App.1991)(despite the fact that the potential juror worked, kept an apartment, and was registered to vote in another county because she received her driver’s license, her paycheck, and her business mail there, spent summers in the county and considers herself a resident of the county, she was held to be such). Cf.
 
 Tyson v. State,
 
 784 So.2d 328 (Ala.Crim. App.2000) (when a juror had changed her voter registration and driver’s license and mailing address to the county in which she was building a house, she was held not to be qualified to serve in trial as a juror due to residency requirements),
 
 Smith v. State,
 
 612 So.2d 1314 (Ala.Crim.App.1992) (despite the fact that the juror lived with his second wife in an adjacent county, he was held to be a resident of the county of prosecution where he had a property interest in a farm located there on which his son was living; he had lived there for 42 years, received his mail there, was registered to vote there, was issued his driver’s license there, transacted most of his business there, and intended to move back when his second wife died).
 

 B.
 

 Yancey contends that the trial court erred by failing to exclude potential juror E.N., who had admitted he had friends who lived in the area of the murder scene during March 1995 and had prior knowledge from conversations with them, which resulted in his being biased. Yan-cey further argues that because this potential juror eventually served on the jury, his bias was particularly damaging.
 

 The record reveals the following voir dire examination of this particular juror by the prosecutor:
 

 “Q. This case has gotten a lot of publicity, TV, newspaper, radio, especially back when it happened.
 

 “A. Yeah. I heard—
 

 “Q. Have you been exposed to any of that?
 

 “A. Well, at the time when it first happened, I heard about it because I worked with some people that stay out that way, so they was (sic) talking about it and stuff.
 

 “Q. There’s nothing wrong with that. That will be my next question. Did you hear it from any people and you said, yeah, I heard it from some people who stayed out there?
 

 “A. Yeah.
 

 “Q. This is the only thing you have to tell the judge, that whether it was TV, radio, newspaper, or friends, that you can put all that aside and base your verdict, if you’re on the jury, on what goes on in this room, the evidence you hear from that stand and the law, Judge Greene, gives you?
 

 “A. Yes, sir.
 

 “Q. You can do that?
 

 “A. Yes, sir.”
 

 (R. 858-59.)
 

 Thereafter, during defense counsel’s examination of the same potential juror, the following occurred:
 

 “Q. I think you indicated that you had heard some information about this case from one of your friends?
 

 “A. Yeah. Back when it was going on I heard about because a lot of people I work with stay in Smiths Station and stuff, and they come in and discuss it and stuff like that, you know, the boy next door and stuff like that.
 

 “Q. That was back in 1995 when this first happened?
 

 “A. Yes, sir.
 

 
 *464
 
 “Q. Do you mind telling the Court what you remember about those conversations?
 

 “A. Well, mostly, they was [sic] commenting and said the lady that works at the store got shot in the face and stuff like that, and she was the clerk. And some people who had been in there getting gas or getting a snack when they come on to work, because I work at night, they said didn’t realize — know what happened and stuff like that, and they had caught the guy that did it and stuff like that.
 

 “Q. Right. Oh, you heard that they had caught the guy who did it?
 

 “A. That’s what they were saying.
 

 “Q. [R.N.], now I realize that was 10 years ago. That was a long time ago.
 

 “A. Yes, it is.
 

 “Q. Let me ask you this. Just roughly, do you remember, and I am not asking you to be specific, but just give me an idea of how many times you had these conversations?
 

 “A. Well, I haven’t had any in the last couple of years. This is my first time now from bringing it back up since I heard about it in the trial here. I haven’t heard it since then.
 

 “Q. No, but I mean back in 1995, you said it was discussed by some of your friends?
 

 “A. Oh, it was just probably one or two times out of the night because we work at night. When we get in the canteen, we just start a little conversation going on and stuff like that.
 

 “Q. Do you specifically remember Mr. Yancey’s name being mentioned as the one they thought to be—
 

 “A. I don’t even know him, nothing like that. No, sir.
 

 “Q. So you don’t necessarily remember the parties to these conversations suggesting that it was Vernon Lamar Yan-cey?
 

 “A. No, sir.
 

 “Q. By name?
 

 “A. No, sir.
 

 “Q. You just remember them saying that the person who was arrested, in their opinion, that was the person who had committed the crime?
 

 “A. As far as I know.”
 

 (R. 864-66.)
 

 Finally, the trial court questioned this same potential juror as follows:
 

 “Q. And would you be willing to follow the law as so stated to you by the court if you should be selected as a juror and determine the credibility of a witness? Can you follow the law?
 

 “A. I can follow the law.
 

 “THE COURT: Okay.”
 

 (R. 873.)
 

 Although this potential juror acknowledged that he had heard some of the facts of the case before the trial, there was no indication through his statements or any other evidence that he had a fixed opinion as to Yancey’s guilt or that he was incapable of rendering an impartial verdict.
 

 “ ‘[A]s the Alabama Supreme Court stated in
 
 Ex parte Grayson,
 
 479 So.2d 76 (Ala.) cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985):
 

 “““To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror’s impartiality would be to establish an impossible standard. It is sufficient if a juror can lay aside his impressions or opinions
 
 *465
 
 and render a verdict based on the evidence presented in court....’
 

 “ ‘ “The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved.
 
 Murphy v. Florida,
 
 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, ‘the proper manner for ascertaining whether adverse publicity may have biased prospective jurors is through the voir dire examination.’
 
 Anderson v. State,
 
 362 So.2d 1296, 1299 (Ala.Crim.App.1978).”
 

 “ ‘479 So.2d at 80. “ ‘ “The relevant question is not whether the community remembered the case, but whether the jurors at [the accused’s] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.”
 
 Patton v. Yount,
 
 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).’ ”
 
 Siebert v. State,
 
 562 So.2d 586, 589 (Ala.Cr.App.1989) aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990), quoting
 
 Fortenberry v. State,
 
 545 So.2d 129 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).’
 

 “Whitehead v. State, 111
 
 So.2d 781, 801-02 (Ala.Crim.App.1999), aff'd,
 
 111
 
 So.2d 854, (Ala.2000).”
 

 Gavin v. State,
 
 891 So.2d 907, 940 (Ala. Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004).
 

 In Alabama, the standard for striking a potential juror for cause because of the juror’s bias requires that the juror have a fixed opinion concerning the defendant’s guilt that would interfere with his ability to render a fair and unbiased verdict.
 

 “Section 12-16-150(7), Ala.Code 1975, states that a juror is subject to being struck for cause if ‘he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict.’
 

 “‘To justify a challenge for cause, there must be a proper statutory ground or “‘some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.’ ”
 
 Clark v. State,
 
 621 So.2d 309, 321 (Ala.Cr.App.1992) (quoting
 
 Nettles v. State,
 
 435 So.2d 146, 149 (Ala.Cr.App.1983)). This court has held that “once a juror indicates initially that he or she is biased or prejudiced or has deepseated impressions” about a case, the juror should be removed for cause.
 
 Knop v. McCain,
 
 561 So.2d 229, 234 (Ala. 1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law.
 
 Ex parte Taylor,
 
 666 So.2d 73, 82 (Ala.1995). A juror “need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.”
 
 Kinder v. State,
 
 515 So.2d 55, 61 (Ala. Cr.App.1986).’ ”
 

 Pace v. State,
 
 904 So.2d 331, 340 (Ala. Crim.App.2003), quoting
 
 Ex Parte Davis,
 
 718 So.2d 1166, 1171-72 (Ala.1998).
 

 In the present case, the potential juror stated that he agreed with the presumption of innocence and that he believed that Yancey was innocent until he might be proven guilty by the evidence at trial. (R. 869.) He also acknowledged that he could follow the law. The record fails to demonstrate any form of bias by this juror that would have required his being removed for cause in order to ensure that Yancey receive a fair trial.
 

 
 *466
 
 C.
 

 Yancey argues that the trial court committed reversible error by overruling his challenge for cause as to potential juror R.F. He argues that this potential juror admitted to being biased but that the trial court allowed her to remain on the venire and to serve on his trial jury. As argued by the State in brief, Yancey does not state the reason or evidence for the alleged bias, and the reference to the trial transcript he cites to support his claim addresses the voir dire examination of another potential juror concerning the weight to be given circumstantial evidence. A review of the voir dire examination of R.F. indicates that she mentioned in the questionnaire that she had filled out for the court that her brother and father had been shot. She stated, upon questioning by the prosecutor, that no one had been apprehended for those crimes. The prosecutor then questioned this potential juror as follows:
 

 “Q. Does that leave a bad taste in your mouth, that they weren’t able to catch the people and punish them that shot your dad or your brother?
 

 “A. No. sir. I mean, not for this case, but if they ever did for their case, then I would probably have an issue with that, but as far as this is concerned, no, sir.
 

 “Q. It wouldn’t affect you in this case?
 

 “A. No, sir.
 

 “Q. Even though that the people [sic] that had hurt your dad and your brother hadn’t been caught or brought to justice?
 

 “A. It wouldn’t.
 

 “Q. All right. Do you have any bad feelings toward the police for not being able to catch the people who shot you dad or your brother?
 

 “A. No, sir.”
 

 (R. 364-65.) Thereafter, defense counsel examined this potential juror and determined that her father had been a Russell County sheriffs deputy, but that the shooting did not occur in Russell County. The potential juror stated that, although her brother had been shot, he survived and was paralyzed from the waist downward. That shooting also did not occur in Russell County. Defense counsel then questioned the potential juror as follows:
 

 “Q. Due to the fact that your dad was killed by gunfire and your brother was — was severely injured, would that have any bearing in you serving in this particular case? Would you be biased against Mr. Yancey or—
 

 “A. No, sir.
 

 “Q. —or anybody else?
 

 “A. No, sir.
 

 “Q. Okay. Do you feel like you could be fair?
 

 “A. Yes, sir.
 

 “Q. Do you understand that and can you subscribe to the principle that a defendant is considered innocent until such time as he may be—
 

 “A. Yes, sir.
 

 “Q. —that he may be proven guilty?
 

 “A. Yes, sir.
 

 “Q. Or not proven guilty?
 

 “A. Yes, sir.”
 

 (R. 368-69.) Thereafter, defense counsel attempted to question the potential juror as to her beliefs concerning the presumption of innocence and, after many exchanges demonstrating the potential juror’s lack of understanding of defense counsel’s questions, counsel stated that he would ask the trial court to question the potential juror concerning the presumption of innocence and the State’s burden of proof. The trial court did so, as follows:
 

 “THE COURT: [R.F.], I think [defense counsel] was attempting to ask you, the
 
 *467
 
 burden of proof is upon State of Alabama to prove the Defendant guilty as charged. Do you feel like that burden should not be upon the State to prove to you that the Defendant did the offense? Do you agree with that concept?
 

 “PJ: No, sir.
 

 “THE COURT: Okay. Do you feel like that the concept ought to be changed; that the Defendant ought to come forward and prove his innocence?
 

 “PJ: If he have [sic] something to prove his innocence, yes, sir.
 

 “THE COURT: Well, you think if he had evidence on his behalf, that he should present it?
 

 “PJ: Yes, sir.
 

 “THE COURT: Do you disagree with the concept that a Defendant is innocent until proven guilty by the State of Alabama beyond a reasonable doubt? Do you agree with that standard in the law?
 

 “PJ: Yes, sir.
 

 “THE COURT: Do you think that ought to be changed?
 

 “PJ: No, sir.
 

 “THE COURT: If the Defendant did not choose — if he chose not testify in this case would you hold that against him?
 

 “PJ: No, sir.
 

 “THE COURT: And you feel like that if he did not testify and the Court instructed you of the fact that he failed to testify, you could not use that against him in determining his guilt, would you follow that instruction by the Court?
 

 “PJ: Yes, sir.
 

 “THE COURT: Would you follow all instructions by the Court in reaching your decision?
 

 “PJ: Yes, sir.”
 

 (R 373-74.) At the close of the voir dire questioning, defense counsels made their requests for strikes for cause of certain potential jurors, among them potential juror R.F. The following transpired:
 

 “[Defense counsel]: [R.F.], her father, who was law enforcement, was murdered in Columbus, Georgia. And she was — she exhibited some confusion as to the presumption of innocence of the Defendant during her voir dire questioning. She never relented, and it appeared to the defense that that was her stand, that the Defendant would have to prove his innocence before she would decide that way.
 

 “THE COURT: Well, I think she was confused by the question is my recollection. I am going to reserve a ruling on that. I want to review her statements about that. Any more?”
 

 (R. 1118-19.) The trial court then requested the court reporter to retrieve potential juror R.F.’s statements in order for the trial court to examine them. Then, after doing so, the trial court denied the challenge.
 

 The trial court did not commit error by denying Yancey’s challenge for cause of this potential juror because there was no indication that she was so biased that she would be unable to consider the evidence, follow the trial court’s instructions, and return an impartial verdict. § 12-16-150(7), Ala.Code 1975;
 
 Pace v. State,
 
 904 So.2d at 340. Initially, we note that the prospective juror’s relationship to a law-enforcement officer does not imply bias, and this officer had no role in the present case. See
 
 Brown v. State,
 
 11 So.3d 866 (Ala.Crim.App.2007) (in which Brown challenged a prospective juror who was related to an employee in the district attorney’s office; however, that relative had no connection to Brown’s case);
 
 McGahee v. State,
 
 885 So.2d 191, 213 (Ala.Crim.App. 2003), cert. denied, 885 So.3d 230 (Ala. 2004) (in which a potential juror was not
 
 *468
 
 due to be excused because of his son-in-law’s role as a prosecutor in the district attorney’s office when that prosecutor was not involved in this case).
 

 Moreover, the fact that the potential juror’s father and brother had been victims of crimes did not imply that she would be biased in this case. See
 
 Hodges v. State,
 
 856 So.2d 875, 908-909 (Ala.Crim. App.2001), aff'd, 856 So.2d 936 (Ala.2003) (in which a prospective juror gave no indication that any of his experiences concerning the rape and robbery of one of his relatives would affect his ability to be impartial; therefore there was no reason to remove him for cause).
 

 Finally, although this potential juror gave responses during questioning that indicated that she may be unable to correctly apply the doctrine of presumption of innocence in Yancey’s case, it is clear from a review of her responses that she was confused by the questioning. She stated to defense counsel that she was unable to follow his questions, whereupon defense counsel responded that he would have the trial court make the appropriate inquiries of this potential juror. She subsequently appropriately responded to the trial court’s questions and indicated that she could apply the presumption of innocence and acknowledged , that the State had the burden of proof in this case. Despite this potential juror’s initial confusion, her responses were rehabilitated upon further examination. “ ‘[J]urors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the Court.’
 
 Johnson v. State,
 
 820 So.2d 842, 855 (Ala.Crim.App.2000).”
 
 Sharifi v. State,
 
 993 So.2d 907, 926 (Ala.Crim.App. 2008). See also
 
 Hyde v. State,
 
 13 So.3d 997, 1011 (Ala.Crim.App.2007), citing
 
 Brownfield v. State,
 
 44 So.3d 1, 34 (Ala. Crim.App.2007).
 

 “ ‘The trial judge is given much discretion in determining whether a potential juror should be struck for cause. According to Rule 18.4(e), Ala. R.Crim. P.:
 

 “ ‘ “When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the Court on its own initiative or on motion of any party, shall excuse that juror from service in the case.”
 

 “ ‘Furthermore, in order to determine whether the trial judge’s exercise of discretion was proper, this Court will look to the questions directed to and answers given by the prospective juror on voir dire.
 
 Ex parte Cochran,
 
 500 So.2d 1179 (Ala.1985).’ ”
 

 Holliday v. State,
 
 751 So.2d 533, 535 (Ala.Crim.App.1999). Also “ ‘[t]he trial judge is in the best position to hear a prospective juror and to observe his or her demeanor.’ ”
 
 McNair v. State,
 
 653 So.2d 320, 324 (Ala.Crim.App.1992), aff'd 653 So.2d 353 (Ala.1994) (quoting
 
 Ex parte Dinkins,
 
 567 So.2d 1313, 1314 (Ala.1990)). Finally,
 

 “ ‘[t]he test for determining whether a strike rises to the level of a challenge for cause is “whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.”
 
 Marshall v. State,
 
 598 So.2d 14, 16 (Ala.Cr.App.1991). “Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.”
 
 Ex parte Nettles,
 
 435 So.2d 151, 153 (Ala.1983). “The decision of the trial court ‘on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to
 
 *469
 
 an abuse of discretion.’ ”
 
 Nettles,
 
 435 So.2d at 153.’
 

 “Dunning v. State,
 
 659 So.2d 995, 996 (Ala.Crim.App.1994).”
 

 Sneed v. State,
 
 1 So.3d 104, 136 (Ala.Crim. App.2007).
 

 In the present case there was no indication that any of these potential jurors could not set aside any opinions they might have and fairly and impartially arrive at a verdict based on the law and the evidence. Therefore, Yancey was not prejudiced by their service.
 

 III.
 

 Yancey argues that the trial court constructively denied his motion for the court to approve all excusáis of potential jurors and that Yancey was prejudiced thereby. Yancey argues that the trial court denied his rights to due process and to a fair trial by allowing the circuit clerk to excuse at least 13 jurors in violation of the trial court’s previous order. Yancey claims that he was denied an impartial jury in that this unlawful action by the circuit clerk may have violated his right to equal protection of the law and because it may have resulted in the wholesale striking of a protected group or gender. Yan-cey cites
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in support of his argument. In his reply brief on appeal, Yancey argues that the State makes his argument “more complicated than intended.” (Yancey’s brief, p. 6.) The State in its brief broke Yancey’s argument into three subsections. Yancey says that he simply argued that the trial court improperly denied his motion to consider and approve all excusáis of potential jurors when it allowed the circuit clerk to excuse 13 jurors without a proper predicate. Yancey claims that such an action does not and cannot ensure that the guidelines of
 
 Batson v. Kentucky,
 
 supra, are met. It is clear that under the proper set of circumstances a trial court may excuse a potential juror from serving on a case, under § 12-16-63, Ala.Code 1975, which states:
 

 “(a) The Court, upon the request of a prospective juror pursuant to this section shall determine on the basis of information provided during an interview with the prospective juror or based on other competent evidence whether the respective juror should be excused from jury service.
 

 “(b) A person who is not disqualified for jury service may apply to be excused from jury service by the court only upon a showing of undue or extreme physical or financial hardship, a mental or physical condition that incapacitates the person, or public necessity for a period of up to 24 months, at the conclusion of which the person may be directed to reappear for jury service in accordance with the Court’s direction.”
 

 Yancey’s argument appears to be that the trial court allowed the circuit clerk to grant the excuses and did not exercise the duty of excusing prospective jurors from service in the present case, and that this “illegal” action by the trial court resulted in the potential for an unfair jury selection. However, in his original brief Yancey argues that 40% of the jurors summoned were African-Americans and that, after the circuit clerk excused some of the jurors, only 30% of the strike list were comprised of African-Americans. Yancey then concedes that after the striking process, a 40% of the trial jury were African-Americans. Yancey seems to argue that the State had to favor a segment of the population, here African-Americans, in order to re-obtain the 40% representation of blacks on the trial jury, in violation of
 
 Batson v. Kentucky,
 
 supra.
 

 
 *470
 
 In
 
 Ex parte Slaton,
 
 680 So.2d 909, 925 (Ala.1996), the Alabama Supreme Court found no error when the trial judge’s secretary dismissed 35 prospective jurors, despite Slaton’s argument that she was not authorized to do so and thus violated his right to a fair and impartial jury. In
 
 Slaton,
 
 the Alabama Supreme Court cited
 
 Windsor v. State,
 
 683 So.2d 1021 (Ala. 1994), and § 12-16-145, Ala.Code 1975, which statute states:
 

 “Prior to the date on which a prospective juror has been summoned to appear, the presiding circuit judge, or a court official designated by him, shall have the authority to disqualify the prospective juror or to excuse or postpone his service to any future date, not withstanding the provisions of any other law.”
 

 In Alabama, it is clear that a trial judge may delegate his authority to excuse jurors to other court officials who may then hear the excuses and who are authorized to accept proper excuses.
 

 “This Court has stated that ‘it is the duty of the court to hear all the excuses and himself pass upon the same.’
 
 Taylor v. State,
 
 249 Ala. 130, 136, 30 So.2d 256, 260 (1947) (citing Title 30, § 38, Code of 1940). However, that statement was made long before the Legislature enacted § 12-16-145, Ala.Code 1975 (Ala. Acts 1981, No. 81-788, p. 1381, § 6), which specifically provides that the presiding circuit judge may delegate to other court officials the judge’s authority to excuse jurors. Clearly, the intent was to ensure that the judge would not be overburdened with calls and letters from students worried about exams, travelers holding non-refundable tickets to exotic destinations, or others allowed to seek disqualification or an excuse or postponement by virtue of age, disability, or other reason. ‘Furthermore, in considering the qualifications of jurors, jury commissioners, [judges, and other properly designated officials] have the right [to], and should, consider the practical availability of prospective jurors.’
 
 Kittle v. State,
 
 362 So.2d 1260, 1264 (Ala.Crim.App.1977), rev’d on other grounds, 362 So.2d 1269 (Ala.1978). We hold that such a delegation of authority would therefore be proper under either plan of jury selection.”
 

 Windsor v. State,
 
 683 So.2d at 1026. See also
 
 Hodges v. State,
 
 856 So.2d 875, 914 (Ala.Crim.App.2001).
 

 In the present case, the record indicates that on January 26, 2005, the trial court granted Yancey’s motion for personal service on potential jurors who do not respond to their summons and for the court to consider and accept or reject all excuses. Thereafter, during a pretrial hearing in which the manner voir dire would be conducted was discussed by the trial court and the attorneys, the following transpired:
 

 “[Defense counsel]: Judge, as part of the procedure, are you going to, on the record, state the reasons why some of the jurors were excused, like our motion that—
 

 “THE COURT: I see no problem with doing that. We’ve had to excuse some for various reasons.
 

 “[Defense counsel]: Yes, sir, but I think we need to say that on the record.
 

 “THE COURT: Yeah, be glad to do that. In fact, if you want to, we can do that now.”
 

 (R. 105-06.) Thereafter, the trial court listed each juror excused and the reasons given by the potential juror. The trial court stated that he had excused 21 potential jurors for medical reasons, and the
 
 *471
 
 record indicates that each of the jurors had a doctor’s note or certifícate to verify their conditions, which included: severe rheumatoid arthritis; major depression with psychotic features; two instances of prostate cancer; neck problems that prohibited sitting for long periods of time;
 
 [5]
 
 recent hip operation; colon cancer; nervous condition; heart disease and chronic anxiety disorder; anxiety disorder; severe asthma; back problems, chronic artery disease and hypertension; complications from pregnancy; chronic obstructive pulmonary disease; congestive heart failure and arthritis; severe spinal stenosis; senile dementia Alzheimer’s type; advanced high grade adenocarcinoma of the prostate; osteoarthritis, peripheral neuropa-thy, burning paresthesia in the feet, and an old cerebrovascular accident; osteoarthritis, osteoporosis, asthma, and hypertension; the scheduling of a surgical procedure; chronic obstructive pulmonary disease, type 2 diabetes, and cardiac arrhythmia; and two potential jurors with letters from their doctors indicating that they could not serve for long periods. The trial court excused five potential jurors who were caregivers for the following reasons: one had a relative with colon cancer, one had a husband on disability who requires 24-hour medical assistance, one had a relative with terminal liver cancer, one had a newborn and no means to afford day care and no means of transportation, and one had five children with no one else to care for them. The trial court also excused two potential jurors who were unable to read, write, or understand English; two potential jurors who had moved, one to Colorado and the other to Lee County; and two college students, one from the University of Alabama in Tuscaloosa the other from Auburn University. One potential juror was deceased, and one potential juror was a convicted felon; both were unable to serve. Subsequently, when the trial court qualified the venire in open court, 23 potential jurors came forward with reasons for which they asked to be excused. The trial court responded to these jurors stating, “We’re going to try to accommodate you if we can.” (R. 203.) Outside the presence of the jury venire, the trial court asked the attorneys if there were any objections to the 23 potential jurors being excused, and no objections were raised by the defense counsel. The trial court stated that one of the potential jurors who had indicated that he could not afford to be unemployed for that period of time was in fact employed by a business located in the State of Alabama and therefore would have to be paid if he served on the jury. This potential juror remained on the panel. Upon questioning the second jury panel, the trial court inquired whether any of the potential jurors felt as if they were physically or mentally unable to comply with the duties of a juror, and 18 potential jurors presented reasons to be excused. After this second jury panel was fully questioned by all the parties, the trial court listed 13 potential jurors outside the presence of the jury venire who did not appear for court or who failed to reappear in court. The trial court asked if either party would like any of these potential jurors to be brought into the courtroom and qualified as jurors, to which both the State and the defense responded negatively. The trial court then indicated that it would excuse those jurors who had asked to be excused during the second jury panel. There were no objections.
 

 Thus, the record indicates that the trial judge personally granted all the potential-juror excuses presented to him as required by § 12-16-63, Ala.Code 1975. None of
 
 *472
 
 the excuses presented by the potential jurors amounted to the fraud described in § 12-16-80, Code of Alabama 1975, which would result in an impingement of the integrity of the jury-selection process.
 

 As in
 
 Windsor v. State,
 
 683 So.2d at 1025, Yancey’s challenge seems to address a Sixth Amendment fair-cross-section argument, without rising to the constitutional level of proving such a constitutional challenge.
 

 “ ‘The initial burden of showing the State’s purposeful or deliberate exclusion of any identifiable group from participation as jurors rests with the appellant. In the absence of a showing of purposeful systematic exclusion, no reversal is required....’
 
 Williams v. State,
 
 375 So.2d 1257, 1266 (Ala.Crim. App.1979), cert. denied, 375 So.2d 1271 (Ala.1979) (citations omitted). Windsor has shown nothing to indicate any purposeful and systematic exclusion of any identifiable class of potential jurors, nor has he shown that he suffered any harm as a result of such an alleged exclusion. Although there may be some slight discrepancy between the percentages of certain classes of persons living in St. Clair County and the percentages of those same classes as represented on the venire from which Windsor’s jury was chosen, no statistical analysis would reveal the invidious discrimination already prohibited by Alabama law. § 12-16-56, Ala.Code.1975.”
 

 Windsor v. State,
 
 supra, at 1026.
 

 “ ‘[A] defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn.
 
 Virginia v. Rives,
 
 100 U.S. [10 Otto] 313, 322-23 [25 L.Ed. 667];
 
 Gibson v. Mississippi
 
 162 U.S. 565 [16 S.Ct. 904, 40 L.Ed. 1075];
 
 Thomas v. Texas,
 
 212 U.S. 278, 282 [29 S.Ct. 393, 394, 53 L.Ed. 512];
 
 Cassell v. Texas,
 
 339 U.S. 282 [70 S.Ct. 629, 94 L.Ed. 839]. Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group.’ ”
 

 Johnson v. State,
 
 502 So.2d 877, 880 (Ala. Crim.App.1987). “The essence of a ‘fair-cross-section’ claim is the systemic exclusion of ‘a “distinctive” group in the community.’
 
 Duren [v. Missouri,
 
 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d, 579 (1979) ].”
 
 Lockhart v. McCree,
 
 476 U.S. 162, 174, 106 S.Ct. 1758, 1765, 90 L.Ed.2d 137 (1986).
 

 In the present case, Yancey has made no claim that a particular distinctive group from the community was systematically excluded from his jury. He merely argues that such an exclusion may occur where potential jurors are excused prior to service by a delegate of the court. Here, the trial judge personally excused the potential jurors, and there is no indication that any particular distinctive group in the community was systematically excluded. Therefore, there is no indication that there was a violation of the fair-cross-section requirement or that Yancey did not receive a fair trial or that he suffered any prejudice by the excusal of these potential jurors. Although Yancey appears to argue that the percentage of African-Americans available to serve on his jury was reduced by these excusáis so that the State had to rectify the discrepancy by striking fewer African-Americans, there is no error on this ground. See
 
 Currin v. State,
 
 535 So.2d 221, 224 (Ala.Crim.App.1988) (“It is significant and a highly ‘relative circumstance’ that blacks were represented on the trial jury in virtually the same and in even a somewhat greater proportion (71%) as they were represented in the county population (70%).”). See also
 
 Merriweather v.
 
 
 *473
 

 State,
 
 629 So.2d 77, 87 (Ala.Crim.App. 1993), and cases cited therein.
 

 IV.
 

 Yancey argues that the evidence presented by the State was insufficient to convict him of capital murder and to impose the death sentence, because, he says, the State relied only on eye-witness identification without making a substantial attempt to corroborate this identification with evidence he alleges was readily available; therefore, he argues, the State ignored its duty and burden of proof as required by § 13A-5-45, Aa.Code 1975. Yancey further argues that because the State did not present all available evidence, the trial court’s rejection or override of a jury recommendation to sentence Yancey to life imprisonment without the possibility of parole violates his Eighth and Fourteenth Amendment rights under the United States Constitution, as well as resulting in a void sentence. Thus, he argues that the State’s failure to meet the burden of proof renders a conviction or sentence void. By citing § 13A-5-45, Aa. Code 1975, Yancey argues that this alleged failure by the State to present all available evidence resulted in its failure to meet the burden of proof as to his sentence as well as to his conviction, because § 13A-5-45 addresses the sentencing hearing upon conviction for a capital offense.
 

 The State presented sufficient evidence to support Yancey’s conviction for capital murder for the intentional murder of Mattie “Pee-Wee” Sports during a robbery in the first degree. Section 13A-5-40(a)(2), Aa.Code 1975. “ ‘It is ... well established that the corpus delicti may be proved by circumstantial as well as direct and positive evidence.’
 
 Zeigler v. State, 52
 
 Ma.App. 501, 504, 294 So.2d 468, 470 (1973), cert. quashed, 292 Aa. 762, 294 So.2d 471 (1974).”
 
 Green v. State,
 
 616 So.2d 389, 390 (Aa.Crim.App.1993). Eyewitness testimony constitutes direct evidence. See
 
 Mathis v. State,
 
 594 So.2d 690, 692 (Aa.Crim.App.1991), remanded with directions, 594 So.2d 692 (Aa.1991), after remand, 594 So.2d 695 (Aa.Crim.App. 1992);
 
 Austin v. State,
 
 434 So.2d 289, 291 (Aa.Crim.App.1983). Direct evidence has been defined as evidence that “demonstrates the existence or non-existence of a precise fact and issue without the need to draw inferences or apply presumptions.” J. Colguitt,
 
 Alabama Law of Evidence
 
 § 1.0 at 2 (1990). As such, credible eyewitness testimony is strong evidence of the stated facts concerning an offense.
 

 “This Court has many times held that in our system of criminal justice we do not travel on the numerical number of witnesses. A fact may be established as firmly by the testimony of one witness as by the testimony of an entire community.
 
 Godbee v. State,
 
 56 Aa.App. 174, 320 So.2d 107 [(1876)];
 
 Haggler v. State,
 
 49 Aa.App. 259, 270 So.2d 690 [ (1972) ];
 
 Arnold v. State,
 
 Aa. Cr.App., 348 So.2d 1092, certiorari denied, Aa., 348 So.2d 1097 [ (1977) ].”
 

 Shelton v. State,
 
 382 So.2d 1175, 1177 (Aa. Crim.App.1980). “The testimony of an eyewitness, standing alone, is sufficient to support a defendant’s conviction....”
 
 Lopez v. State,
 
 415 So.2d 1204, 1206 (Aa. Crim.App.1982). Moreover, the testimony of a victim alone can support a prima facie case. “[T]he law in Aabama is well settled that a conviction can be based on only the testimony of one witness such as a victim of the crime.
 
 Williamson v. State,
 
 Aa. Cr.App., 384 So.2d 1224 (1980).”
 
 Williams v. State,
 
 415 So.2d 1171, 1174 (Aa.Crim.App.1982).
 

 “ ‘[A] jury may believe or disbelieve all or any part of the testimony presented by either side, and even when all of the evidence against an accused comes from
 
 *474
 
 the victim[s], the jury may believe such uncorroborated testimony beyond a reasonable doubt and convict the accused.’ ”
 

 Acklin v. State,
 
 790 So.2d 975, 1009 (Ala. Crim.App.2000), cert. denied, 790 So.2d 1012 (Ala.2001). See also
 
 Myers v. State,
 
 677 So.2d 807 (Ala.Crim.App.1995).
 

 In the present case, Yancey’s conviction was supported by more than the eyewitness testimony of Lisa Navas. The State presented ample corroborating evidence, including the surveillance videotape from which the store manager was able to identify Yancey as the gunman; an eyewitness who saw Yancey outside Tyler’s Grocery Store just before the murder; personal items, such as Yancey’s shirt, raincoat, ski mask, and gloves that had been discarded along the trail between Tyler’s Grocery Store and Yancey’s house; hairs taken from the ski mask, which were consistent with Yancey’s; the murder weapon and empty shotgun shells found under a house close to Yancey’s house; and expert testimony that the bruise on Yancey’s torso was consistent with an injury that might be received from firing a sawed-off shotgun.
 

 “In
 
 Cumbo v. State,
 
 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979), this court set out the following rules:
 

 “ ‘In reviewing a conviction based on circumstantial evidence, this Court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.
 

 “ ‘Whether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the defendant’s guilt is a question for the jury and not the Court.
 

 “ ‘The true test of the sufficiency of circumstantial evidence to justify a conviction is whether the circumstances as proved produce a moral conviction to the exclusion of every reasonable doubt. It is not necessary for the circumstances to be “such as are absolutely incompatible, upon any reasonable hypostasis, with the innocence of the accused.” ’ [Citations omitted.]”
 

 Austin v. State,
 
 434 So.2d 289, 291 (Ala. Crim.App.1983).
 

 Clearly, the prosecution presented sufficient evidence, both direct eyewitness testimony and circumstantial evidence, to support Yancey’s conviction. The State is not required to perform every possible test or to produce any feasible evidence that may hold little probative value. Yancey was given access to any discovery he specifically requested and made a showing of relevance and materiality.
 

 “Time and time again the courts of this State have held that an accused is not entitled to the inspection or discovery of evidence in the possession of the prosecution to conduct a mere fishing expedition in preparation of his defense.
 
 Smith v. State,
 
 282 Ala. 268, 210 So.2d 826 (1968);
 
 Sanders v. State,
 
 278 Ala. 453, 179 So.2d 35 (1965);
 
 Cooks v. State,
 
 50 Ala.App. 49, 276 So.2d 634, cert. denied, 290 Ala. 363, 276 So.2d 640 (1973). This principle comports with the general proposition that a defendant is not, as a matter of right, entitled to inspection or disclosure of evidence in the possession
 
 *475
 
 of the prosecution prior to trial.
 
 Bellew v. State,
 
 238 Miss. 734, 106 So.2d 146 (1958), cert. denied, 360 U.S. 473, 79 S.Ct. 1430, 3 L.Ed.2d 1531 (1959). Also see Annot.,
 
 Discovery-Prosecution’s Evidence,
 
 7 A.L.R.3d 8, 22 (1966); C. Gamble,
 
 McElroy’s Alabama Evidence,
 
 Section 290.05 (3rd Ed.1977).
 

 “Furthermore, the defendant received all the specific information he requested.”
 

 Killough v. State,
 
 438 So.2d 311, 316 (Ala. Crim.App.1982), rev’d on other grounds, 438 So.2d 333 (Ala.1983). See also
 
 State v. Stallworth,
 
 941 So.2d 327, 339-40 (Ala. Crim.App.2006) (where capital defendant requested disclosure of all physical and DNA evidence to determine whether his counsel had been ineffective, this court held that because of a lack of relevance, the request amounted to nothing more than an impermissible fishing expedition to investigate the possibility of new postcon-viction claims).
 

 The State also presented sufficient evidence to support Yancey’s sentence. Although Yancey alludes to the propriety of the trial court’s overriding the jury’s recommendation in this argument, that matter will be discussed infra. See Part VI. The State’s burden of proof at the sentencing phase of a capital-murder trial is established by § 13A-5-45(e), Ala. Code 1985, which states:
 

 “At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing.”
 

 Moreover, at least one aggravating circumstance must be found in order to support a sentence of death. § 13A-5M5(f), Ala. Code 1975. Thus, under Alabama law, the State was entitled to have the aggravating circumstance that the capital offense was committed while Yancey was engaged in the commission of a robbery, § 13A-5-49(4), Ala.Code 1975, accepted as proven.
 

 In his reply brief, Yancey argues that the State presented no evidence at the sentencing hearing other than that presented at trial. He further contends that the prior convictions in Georgia introduced by the State were inadmissible because the convictions did not show that Yancey was represented by counsel at the time of each of the conviction or that the convictions qualified to be considered. Finally, he submits that the presentence reports allegedly relied on irrelevant and inadmissible matters and conclusions. Yancey fails to give any specifics in regard to the latter.
 

 As to the presentence report, the record indicates that Yancey did not object when the trial court ordered the report to be completed and submitted. Thereafter, following the arguments from the parties at the close of the sentencing hearing before the trial court, the court acknowledged that it had received the presentence report and confirmed that Yancey’s counsel had also received the report. The trial court noted that the presentence report would be made a part of the record and asked if there were any objections to any part of the report. There were no objections; therefore, this matter is being analyzed pursuant to the plain-error rule. Rule 45A, Ala. R.App. P.
 

 In
 
 Beckworth v. State,
 
 946 So.2d 490, 524-27 (Ala.Crim.App.2005), Beckworth argued that his presentence report contained inaccurate and irrelevant information and claimed as erroneous “ ‘anything
 
 *476
 
 presented in the presentence report that was not presented to the jury.’”
 
 Beckworth v. State,
 
 946 So.2d at 525. This court addressed each specific claim of error in the presentence report raised by Beckworth and found no plain error. In doing so, this court stated:
 

 “This Court recently summarized the legal principles relevant to our review of claims of error in a presentence report:
 

 “ ‘Section 13A-5-47, Ala.Code 1975, specifically states that before a circuit court may sentence a defendant convicted of a capital offense the circuit court must direct that a presentence report be prepared on the defendant. Rule 26.3(b), Ala. R.Crim. P., addresses the contents of the presentence report and states that the report may contain:
 

 “ ‘ “(1) A statement of the offense and the circumstances surrounding it;
 

 “‘“(2) A statement of the defendant’s prior criminal and juvenile report, if any;
 

 “ ‘ “(3) A statement of the defendant’s educational background;
 

 “ ‘ “(4) A statement of the defendant’s employment background, financial condition, and military record, if any;
 

 “ ‘ “(5) A statement of the defendant’s social history, including family relationships, marital status, interests, and activities, residence history and religious affiliations;
 

 ‘““(6) A statement of the defendant’s medical and psychological history, if available;
 

 ““‘(7) Victim Impact Statements; and
 

 “‘“(8) Any other information required by the Court.”
 

 “ ‘Here, the circuit court’s sentencing order clearly states that each party was given a copy of the presentence report, yet [appellant] never challenged any inaccuracies in the report. Section 13A-5-47(d), Ala.Code 1975, specifically provides that the circuit court must make “written findings of fact summarizing the crime and the defendant’s participation in it.” The findings made by the circuit court were clearly based on the evidence presented during the trial, and they did not contain any of the inaccuracies that [appellant] challenges in the presentence report.
 

 “ ‘Moreover [the appellant] cites nothing in the circuit court’s order that would indicate that the court relied on the now-challenged contents of the presentence report.’ ”
 

 Beckworth v. State,
 
 946 So.2d at 525.
 

 A review of the presentence reports in the present case demonstrate that they were prepared in compliance with § 13A-5-47. As Yancey raises no specific allegations of inaccuracies or the subject matter he deems irrelevant, he has made no showing that the trial court relied on any improper evidence or information.
 

 Pursuant to Alabama caselaw and § 13A-5-47, a presentence report is mandatory.
 
 Washington v. State,
 
 [Ms. CR-05-1297, January 12, 2007]-So.3d -, - (Ala.Crim.App.2007). Moreover, as noted in
 
 Washington v. State,
 
 quoting
 
 Guthrie v. State,
 
 689 So.2d 935 (Ala.Crim. App.1996), such a presentence report is required to be complete and to contain all pertinent information as it is essential to the trial court’s consideration of the defendant’s “ ‘background and circumstances before determining the proper sentence.’” — So.3d at-. We find no plain error in the trial court’s admission and consideration of the presentence report.
 

 
 *477
 
 As to Yancey’s claims concerning the prior convictions, these were admitted by the State in order to prove two aggravating circumstances: that Yancey was on parole for the commission of a felony offense at the time of the commission of the present capital offense, § 13A-5-49(l), Ala.Code 1975; and that Yancey had previously been convicted of a felony involving the use or threat of violence to a person. Section 13A-5-49(2), Ala.Code 1975. Upon admitting the certified copies of these convictions at the sentencing hearing before the trial court, the prosecutor stated:
 

 “We had submitted to the Court and the defense the certified copies where Mr. Yancey was convicted of biting off a person’s nose, where he was convicted of assaulting a human being with a beer bottle, where he was convicted of shooting another human being with a firearm and ... [i]mpersonating a police officer.”
 

 (R. 2010.) Thereafter, in entering his findings as to the existence of the aggravating circumstances proven in this case, the trial court stated:
 

 “First, that the Defendant, Vernon Lamar Yancey, committed the capital offense of murder committed while the Defendant was engaged in the commission of a robbery in the first degree. Second, the Defendant, Vernon Lamar Yancey, committed the above said capital offense while he was under a sentence of imprisonment. The Defendant at the time of the commission of the capital offense was on parole for the commission of a felony offense, aggravated assault, in Superior Court Case Number 88-CR-54964, Muscogee County, Georgia. Third, the Defendant, Vernon Lamar Yancey, was previously convicted of a felony criminal offense involving the use of violence to a person. The Defendant was convicted pri- or to the commission of this capital offense in Count 2 of Case Number 88-CR-54964 in the Superior Court of Muscogee County, Georgia, with aggravated assault for the shooting of another person with a gun.”
 

 (R. 2034-35.)
 

 The record contains the certified copy of Yancey’s conviction in criminal action no. 88-CR-54964-4
 
 [6]
 
 in the Superior Court of Muscogee County, Georgia, for the offense of aggravated assault, charging that on December 5, 1987, Yancey unlawfully assaulted and struck Richard Palmer with a bottle, the same being considered a deadly weapon, and in Count 2, Yancey was charged with aggravated assault for unlawfully assaulting and shooting Guerry Kevin Baron with a pistol on January 23, 1988. The record indicates Yancey pleaded guilty for the two counts and was sentenced to 15 years with 10 years to be served and the 5-year remainder served on probation. The record further indicates that Yancey was represented by “The Honorable Garner, Attorney at Law,” by appointment. Although Yancey would have been 17 when he committed these offenses, he was tried as an adult; thus, this was a criminal conviction rather than a juvenile adjudication and could properly be used as an aggravating circumstance.
 
 Ex parte Burgess,
 
 811 So.2d 617, 623 (Ala.2000) (juvenile adjudications may be considered by a trial court when conducting its “weighing” duties during sentencing in a capital case; however, a juvenile adjudication may not be used to negate the mitigating circumstance of “no significant” history of prior criminal activity). This aggravated-assault conviction was the only prior offense the judge con
 
 *478
 
 sidered in determining that the State had proved the two pertinent aggravating circumstances.
 

 In
 
 Bush v. State,
 
 695 So.2d 70, 91 (Ala. Crim.App.1995), aff'd, 695 So.2d 138 (Ala. 1997), the appellant argued that the trial court had erred in allowing his prior robbery conviction to prove the aggravating circumstance that he had previously been convicted of another capital offense or felony involving the use or threat of violence to the person. § 13A-5-49(2), Ala.Code 1975. One of his arguments was that the State failed to prove that he had been represented by counsel at the guilty-plea proceedings. This court noted that the docket sheet showed that he was represented by a certain attorney at arraignment and at the guilty-plea and sentencing proceedings. “If the court document indicates that a defendant was represented by counsel, it is presumed that counsel was present at all critical stages of the proceedings. Section 13A-5-10.1(c).”
 
 Bush v. State,
 
 695 So.2d at 91. In the present case, the record clearly indicates that Yan-cey was represented by counsel at his guilty-plea proceedings for the aggravating-assault charge.
 

 Moreover, in
 
 Burgess v. State,
 
 723 So.2d 742, 769 (Ala.Crim.App.1997), aff'd, 723 So.2d 770 (Ala.1998), Burgess argued that the aggravating circumstance that he had previously been convicted of a violent felony was improperly found in his case, because his previous conviction in Mississippi for kidnapping was invalid. This court rejected Burgess’s claim, stating:
 

 “We have held that a defendant at his sentencing hearing cannot attack the validity of a prior conviction used to enhance his sentence as a habitual felony offender.
 
 E.g., James v. State,
 
 681 So.2d 269, 269-71 (Ala.Cr.App.1996);
 
 McHarris v. State,
 
 623 So.2d 400, 400-01 (Ala.Cr.App.1993). That rule is equally applicable here. Burgess cannot attack the validity of his Mississippi convictions in Alabama; those convictions are subject to challenge in the Mississippi court that entered the convictions.”
 

 723 So.2d at 769.
 

 The State presented sufficient evidence to support Yancey’s sentence of death because the State met its burden of proof in establishing the aggravating circumstances at the sentencing phase. The three aggravating circumstances proven in this case were all supported by the evidence and met the reasonable-doubt standard of proof. § 13A-5^9, Ala.Code 1975.
 

 V.
 

 Yancey argues that the prosecutor committed reversible error by referring to Yancey in closing argument as a snake taking things to his “snake hole.” The record indicates that the prosecutor made reference to evidence found in a “snake hole” once during his closing argument and once again during the rebuttal portion of his closing argument. Initially, addressing defense counsel’s argument that the lack of fingerprints on the gun exonerated Yancey, the prosecutor stated, “If you are clever enough to put on gloves and a long-sleeved shirt to go in and rob PeeWee, you are clever enough to wipe this thing down in your snake hole where you hide it, so what’s the point[?]” (R. 1873.) Subsequently, again addressing the lack of fingerprint evidence, the prosecutor stated, “I mean, gee-whiz, if we wanted to frame [Yancey], we’d have just thrown the shotgun in there. Instead, we showed you where we found it, just strangely next to his house, where he could hide it in- his snake hole which he knew was there.” (R. 1897.) The prosecutor was referring to the area under the neighbor’s house where the gun and shells were found as a “snake hole.” Yancey made no objection at trial
 
 *479
 
 to these comments; therefore, we will review these under the plain-error doctrine. Rule 45A, Ala. R.App. P.
 

 In
 
 Ringer v. State,
 
 501 So.2d 493, 494-95 (Ala.Crim.App.1986), the appellant objected to the prosecutor’s reference to him during closing argument as a snake. In concluding that this comment or characterization by the prosecutor did not constitute error, this court stated:
 

 “[N]ot every epithet of ‘snake’ will fatally poison the case. In
 
 Liner v. State,
 
 350 So.2d 760, 763 (Ala.Cr.App.1977), Judge Bowen stated as follows:
 

 “ ‘In closing argument, the district attorney referred to the appellant as a “rattlesnake” and a “viper” who sucks the blood from the youth of our country before they can reach maturity. While this argument was highly improper,
 
 Cassady v. State,
 
 51 Ala.App. 544, 287 So.2d 254 (1973), it is not reversible error. The trial court sustained appellant’s objection to this type of argument and instructed the jury on what they were to consider. His motion for mistrial was overruled. As we noted in
 
 Cassady, supra,
 
 51 Ala.App. at 547, 287 So.2d at 257:
 

 “ ‘ “Had appellant thought that more corrective measures were necessary, it was incumbent upon him to move the court to exclude this remark from the jury’s consideration. In the absence of such a motion, the question is not properly presented for revision.
 
 McGrew v. State,
 
 21 Ala.App. 266, 107 So. 328;
 
 Stephens v. State,
 
 250 Ala. 123, 33 So.2d 245.” ’
 

 “Prejudicial remarks made by counsel during the course of a trial must be judged in context, on their own merits, on a case by case basis.
 
 Smith v. State,
 
 282 Ala. 268, 210 So.2d 826 (1968).”
 

 See also
 
 Cook v. State,
 
 416 So.2d 800, 802 (Ala.Crim.App.1982) (Prosecutor’s comment in closing argument to the jury that, “What kind of man would have a snake tattooed on his forehead?” did not require reversal).
 

 The prosecutor’s reference to the hiding place under the house where the murder weapon and other evidence were concealed as a “snake hole” and the perpetrator who concealed the evidence as a “snake,” while derogatory and somewhat inappropriate, did not constitute plain error.
 

 “ ‘The law is clear that “ ‘[i]n a proper case, the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case.’ ”
 
 Nicks v. State,
 
 521 So.2d 1018, 1023 (Ala.Cr.App.1987), affirmed, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988).’
 

 “666 So.2d at 65; See also
 
 Bankhead [v. State
 
 ], 585 So.2d at [97,] 106 [ (Ala.Crim.App.1989) ] (derogatory or opprobrious characterizations are not improper when they are based on the evidence). It is not enough that a prosecutor’s comment in closing arguments was undesirable or even universally condemned; the question instead is whether the comment ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’
 
 Burton [v. State],
 
 651 So.2d [641,] at 651 [ (Ala.Crim.App.1993),] quoting
 
 Darden v. Wainwright,
 
 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986).
 

 “Here, the prosecutor’s reference to Melson as an ‘animal’ accorded with the evidence presented at trial concerning the brutal and cold-blooded nature of the murders. Moreover, as we have previously stated, a prosecutor’s com
 
 *480
 
 ment must be viewed as delivered in the heat of debate and, as such, is usually valued by the jury at its true worth. “‘[W]e must not lose sight of the fact that a trial is a legal battle, a combat in a sense and not a parlor social affair. The solicitor is yet under duty to prosecute with earnestness and vigor, to strike hard blows, but not foul ones.”
 
 Berger v. United States,
 
 [295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)].’
 
 Taylor [v. State,]
 
 666 So.2d [36] at 64, [ (Ala.Crim.App.1994) ], quoting
 
 Arant v. State,
 
 232 Ala. 275, 280, 167 So. 540, 544 (1936). We find no plain error here.”
 

 Melson v. State,
 
 775 So.2d 857, 885 (Ala. Crim.App.1999)
 

 In the present case, there was no plain error concerning the prosecutor’s comments.
 

 VI.
 

 Yancey argues that the trial court’s override of the jury’s advisory recommendation of life imprisonment without parole violates the Eighth and Fourteenth Amendments to the United States Constitution and Alabama law. Yancey argues that the evidence presented at the sentencing hearing was insufficient to support the trial court’s decision to override the jury. However, as previously addressed, see Part IV, the State presented sufficient evidence to support Yancey’s sentence by finding the existence of three aggravating circumstances that were supported by evidence beyond a reasonable doubt. Section 13A-5-45(e), Ala.Code 1975. The trial court properly considered as an aggravating circumstance that the capital offense was committed while Yancey was engaged in the commission of a robbery, § 13A-5-50; that Yancey had been previously convicted of another felony involving the use or threat of violence to the person based on his prior conviction for aggravated assault, § 13A-5-49(2); and that the capital offense was committed by Yancey while he was under a sentence of imprisonment, specifically on parole for the aggravated-assault conviction, § 13A-5-49(l). See § 13A-5-39(7), Ala. Code 1975 (“As used in section 13A-5-49(l), the term [under sentence of imprisonment] means while serving a term of imprisonment, while under a suspended sentence, while on probation or parole, or while on work release, furlough, escape, or any other type of release or freedom while or after serving a term of imprisonment, other than unconditional release and freedom from expiration of the term of the sentence”).
 
 Gavin v. State,
 
 891 So.2d 907, 988 (Ala.Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004), cert. denied,
 
 Gavin v. Alabama,
 
 543 U.S. 1123, 125 S.Ct. 1054, 160 L.Ed.2d 1073 (2005). There was sufficient evidence presented at the sentencing hearing to support the trial court’s decision to override the jury’s advisory verdict.
 

 However, the record indicates that the trial court’s order does not comply with its duty to consider the jury’s recommendation of life imprisonment without parole as a mitigating circumstance.
 
 Ex parte Carroll,
 
 852 So.2d 833, 836 (Ala.2002). This holding in
 
 Ex parte Carroll
 
 and its progeny instruct the trial judge to consider a jury override as a nonstatutory mitigating circumstance,
 
 Sneed v. State,
 
 1 So.3d 104 (Ala.Crim.App.2007), and that the trial judge must fully set forth his reasons for overriding the jury’s advisory verdict.
 

 Although in the present case the trial court clearly indicated that it was considering and weighing the jury’s advisory verdict, it did not indicate that it was considering the verdict as, and giving the weight to be accorded, a nonstatutory mitigating circumstance.
 

 “In
 
 [Ex parte] Carroll[,
 
 852 So.2d 833, 836 (Ala.2002) ], this Court stated:
 

 
 *481
 
 “ ‘We take this opportunity to further explain the effect of a jury’s recommendation of life imprisonment without the possibility of parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending the sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to jury, such as conflicting evidence concerning the identity of the “triggerman” or recommendation of leniency by the victim’s family; the jury’s recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.’
 

 “852 So.2d at 836 (footnote omitted). The State urges us to overrule
 
 Carroll,
 
 ‘at least insofar as it declared that a recommendation of life by the jury “is to be treated as a mitigating circumstance.” ’ State’s brief at 36. We decline to do so.”
 

 Ex parte Tomlin,
 
 909 So.2d 283, 285 (Ala. 2003).
 

 In
 
 Ex parte Tomlin,
 
 the Alabama Supreme Court concluded that although the trial court stated in its order that it had given “ ‘serious consideration to the unanimous recommendation of the jury for life [imprisonment] without parole,’ ”
 
 Ex parte Tomlin,
 
 909 So.2d at 286, it did not properly consider the jury’s recommendation as a mitigating circumstance. The Court determined that the trial court’s stated reason for overriding the jury’s recommendation — because the other perpetrator was convicted of the same capital offense and sentenced to death — was not a proper reason for undermining a mitigating circumstance; moreover, the jury’s recommendation rested on an adequate factual basis.
 
 Ex parte Tomlin,
 
 supra at 287.
 

 Although this case must be remanded for the trial court to consider the jury recommendation as a nonstatutory mitigating circumstance, we note that in a case with facts similar to those of the present case, where the trial court considered the jury recommendation as a nonstatutory mitigating circumstance, this court held that the stated reasons for the court’s override properly supported the override. In
 
 Sneed v. State,
 
 supra, where the jury returned an advisory verdict of life imprisonment without parole also by a vote of 5 in favor of the death penalty and 7 in favor of life imprisonment, the trial court accorded the advisory verdict “moderate weight” as a nonstatutory mitigating circumstance and stated as follows:
 

 “ ‘The jury recommended the defendant be sentenced to life imprisonment without the possibility of parole. This non-statutory mitigating circumstance does exist and must be considered by the court. The vote was 5 in favor of the death penalty and 7 in favor of life without possibility of parole. The vote was almost equally split. Accordingly, this non-statutory mitigating circumstance is entitled to moderate weight in considering the appropriate sentence to impose in this case.
 

 “ ‘The court overrides the jury recommendation in this case for several reasons. The capital offense was committed during the course of a robbery in a store that was purposefully chosen by the defendant where only one person was working. The capital offense is especially heinous, atrocious and cruel. Mr. Terry was gunned down without any reason. He was unarmed and de
 
 *482
 
 fenseless, and he knew he was being shot at by masked intruders. The court can only imagine the terror he felt as he dove behind the counter trying to escape. The jurors witnessed the videotape of the robbery and murder and saw firsthand the defendant’s involvement in the capital offense. The jury found the defendant had the particularized intent to kill even though he was not the trig-german. The court did not believe the defendant’s testimony that he did not intend anyone to be killed and that he did not know that Hardy was going to shoot. The court is convinced from all the evidence that the defendant did nothing to stop Hardy because he did not want to stop the killing. The defendant wanted the money in the cash register, and that was all he was focused on while in the store. The court does not attribute the defendant’s unfortunate upbringing and experiences as excuses for or explanations for his total lack of regard for the life of Mr. Terry as is evident by the defendant’s actions in this case. The sentence of death is not disproportionate or excessive when compared to penalties imposed in similar cases.’ ”
 

 Sneed v. State,
 
 1 So.3d at 115-116 (footnote omitted).
 

 In upholding the trial court’s decision to override the jury’s recommendation in
 
 Sneed,
 
 this court noted that although the trial court did not override this recommendation using information that was not known to the jury, the holding in
 
 Ex parte Carroll
 
 “did not state that that was the only circumstance in which a jury recommendation could be overridden.”
 
 Sneed v. State,
 
 1 So.3d at 116.
 

 In the present case, the trial court made the following findings concerning the jury’s advisory verdict:
 

 “The jury’s recommendation. The trial jury in this case returned a recommended sentence of life [imprisonment] without the possibility of parole. Seven members of the jury recommended a sentence of life [imprisonment] without parole and five members recommended the death penalty. This Court is of the opinion that the State of Alabama at the sentencing hearing conclusively proved beyond a reasonable doubt the existence of three aggravating circumstances as enumerated in the Code of Alabama of 1975, as amended. One, the Defendant, Vernon Lamar Yancey, committed the capital offense of murder while the Defendant was engaged in the commission of a robbery in the first degree. Two, the Defendant, Vernon Lamar Yancey, committed a capital offense while he was under a sentence of imprisonment. Three, the Defendant, Vernon Lamar Yancey, was previously convicted of a felony criminal offense involving the use of violence to a person.
 

 “Defense counsel presented no arguments or evidence that any of the statutory enumerated mitigating circumstances should apply. At the sentencing hearing, only two witnesses were called on behalf of the Defendant, Mary Beth Flanigan and Michelle Harrison. Both of these individuals testified, in effect, that Vernon Lamar Yancey grew up in a dysfunctional home. The Court finds that the defense established a non-enumerated statutory mitigating circumstance for the jury’s consideration. The undersigned judge takes into consideration the jury’s recommendation in this matter, but finds from the presentation of evidence at the sentencing recommendation hearing and from the presentation of evidence at the sentencing hearing held on March the 16th of 2005, that the aggravating circumstances, clearly, beyond a reasonable doubt, outweigh
 
 *483
 
 any mitigating circumstance established in this case.
 

 “At closing argument in the sentence recommendation phase, defense counsel did not argue or suggest any mitigating circumstance for the jury to consider, nor did defense counsel on any single occasion urge or ask the jurors to weigh mitigating circumstances against aggravating circumstances in making their recommendation. In closing argument, defense counsel told the jurors they had a choice. He quoted scripture, told the Biblical story of Cain versus Abel, and pointed out to the jury that God had chosen banishment for Cain over requiring his death. Defense counsel also presented to the jury that if life [imprisonment] without parole was recommended by the jury, that the defendant would be away from his family, locked up in a small cell somewhere way away from here. Defense counsel concluded with asking the jury to vote pro life. Taking Vernon Yancey’s life is not going to bring Pee-Wee back alive.
 

 “The obvious purpose of this closing argument was to appeal to the Christian religious sentiment of the jury and ask the jury to consider factors other than mitigating and aggravating circumstances in reaching a recommendation. The Court finds that this may have influenced the jury in making a recommendation which was contrary to the evidence presented.
 

 “After giving full measure and weight to each of the aggravating and mitigating circumstance or circumstances, and giving full and fair consideration to the recommendation of the jury in its advisory sentencing verdict, it is the judgment of the Court that the gravity of the three aggravating circumstances as proven by the evidence in this case far outweighs the one mitigating circumstance proven by the evidence in this case.”
 

 (R. 2041-44.)
 

 Thus, the trial court fully established its reasons for overriding the advisory verdict. However, the trial court did not state in its findings that it was according the jury’s verdict the weight of a nonstatu-tory mitigating circumstance; therefore, out of an abundance of caution, this cause shall be remanded to the trial court in accordance with
 
 Ex parte Carroll,
 
 supra. On remand, the trial court should reweigh the aggravating and mitigating circumstances and resentence Yancey. The trial court’s amended sentencing order shall be submitted to this court within 42 days of the date of this opinion. We pretermit our plain-error review of Yancey’s death sentence pending the trial court’s return to remand.
 

 The foregoing opinion was prepared by Retired Appellate Judge H.W. “Bucky” McMillan while serving on active-duty status as a judge of this court under the provisions of § 12-18-10(e), Code of Alabama 1975.
 

 AFFIRMED AS TO CONVICTION; REMANDED WITH DIRECTIONS AS TO SENTENCING.
 

 WISE, P.J., concurs.
 

 WELCH, WINDOM, and KELLUM, JJ., concur in the result.
 

 On Return to Remand
 

 MAIN, Judge.
 

 Vernon Lamar Yancey was convicted of capital murder for the death of Mattie “Pee-Wee” Sports during the robbery of Tyler’s Grocery Store, see § 13A-5-40(a)(2), Ala.Code 1975. This court affirmed the conviction on March 20, 2009.
 
 Yancey v. State,
 
 65 So.3d 452 (Ala.Crim.
 
 *484
 
 App.2009).
 
 [1]
 
 However, this Court remanded the case for the trial court to clarify its sentencing order because the trial court did not state in its order that it was according the jury’s recommendation of life imprisonment without parole the weight of a nonstatutory mitigating circumstance. This Court therefore ordered the trial court to reweigh the aggravating circumstances and the mitigating circumstances and to resentence Yancey in accordance with
 
 Ex parte Carroll,
 
 852 So.2d 833, 836 (Ala.2002). The trial court, on return to remand, has submitted an amended sentencing order and has again sentenced Yancey to death.
 

 In his amended sentencing order, the trial judge again found that the State sufficiently proved the existence of three aggravating circumstances: that Yancey committed the capital offense of intentional murder while he was engaged in the commission of a first-degree robbery; that Yancey committed the capital offense while he was under a sentence of imprisonment; and that Yancey had been previously convicted of a felony offense involving the use of violence on a person.
 

 As to the mitigating circumstances, the trial court stated that defense counsel presented no arguments or evidence of the existence of any statutory mitigating circumstances. The trial court did find the existence of two nonstatutory mitigating circumstances: that Yancey was raised in a dysfunctional family environment and that the jury recommended a .sentence of life imprisonment without parole.
 

 The trial court then weighed the aggravating circumstances and the mitigating circumstances and concluded:
 

 “The undersigned Judge takes into consideration both of these non-statutory mitigating circumstances, but finds from the presentation of evidence at the jury’s sentencing recommendation hearing, and from the presentation of evidence at the sentencing hearing held on March 16, 2005, that the aggravating circumstances, clearly, beyond a reasonable doubt, outweigh the two mitigating circumstances established in this case.
 

 “After giving full measure and weight to each of the aggravating circumstances and giving full and fair consideration to the two mitigating circumstances proven in this case, which includes the jury’s advisory sentencing verdict, it is the judgment of the Court that the gravity of the three aggravating circumstances as proven by the evidence in this case far outweigh the two mitigating circumstances proven by the evidence in this case.”
 

 (Supp. C. 106.)
 

 The trial court’s findings concerning the nonstatutory mitigating circumstances, including the jury’s advisory verdict, were appropriately considered and, as we previously held following the first sentencing order, “[t]he trial court fully established its reasons for overriding the advisory verdict.” 65 So.3d at 483.
 

 “Tt is not required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sentencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.
 
 Cochran v. State,
 
 500 So.2d 1161 (Ala.Crim.App.
 
 *485
 
 1984), aff'd in pertinent part, remanded on other part, 500 So.2d 1179 (Ala. 1985), aff'd on return to remand, 500 So.2d 1188 (Ala.Cr.App.), aff'd 500 So.2d 1064 (Ala.1986), cert. denied, 481 U.S. 1088, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).’
 

 “Haney v. State,
 
 603 So.2d 368, 389 (Ala. Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992). See also
 
 Lewis v. State,
 
 24 So.3d 480, 523 (Ala.Crim.App.2006);
 
 Yeomans v. State,
 
 898 So.2d 878, 904 905 (Ala.Crim.App.2004).”
 

 Spencer v. State,
 
 58 So.3d 215, 255 (Ala. Crim.App.2008) (opinion on return to second remand).
 

 The trial court stated in its amended sentencing order that “[a]ll other findings in the sentencing order dated March the 16th of 2005 not specifically changed by [the] amended sentencing order remain in full force and effect.” (Supp. R. 8.)
 

 Because the trial court has complied with this court’s order on return to remand as to the sentencing order, Yancey’s sentencing proceedings will now be reviewed pursuant to Rule 45A, Ala.R.App.P. As that rule requires, we have searched the entire proceedings for any plain error or defect that has or probably has adversely affected any of Yancey’s substantial rights. We have also reviewed the propriety of the sentence of death as required by § 13A-5-53(a), Ala.Code 1975. It is the finding of this court that there is no error in the sentencing that adversely affected Yancey’s rights.
 

 We held in our original opinion of March 20, 2009, that the trial court’s findings as to the aggravating circumstances were proper. Having also reviewed the amended sentencing order, we now hold that the trial court’s findings as to the statutory and nonstatutory mitigating circumstances are also proper and supported by the record.
 

 It is the finding of this court that death is the proper sentence in this case. There is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(2), Ala.Code 1975, requires this court to weigh the aggravating and mitigating circumstances independently to determine the propriety of Yancey’s sentence of death. An independent weighing of the aggravating circumstances and the mitigating circumstances indicates that death is the proper sentence. As required by § 13A-5-53(b)(3), Ala.Code 1975, this court must determine whether Yancey’s sentence was disproportionate or excessive when compared to penalties imposed in similar eases. The sentence of death in this case is neither excessive nor disproportionate to the penalties imposed in similar cases, considering the crime and Yancey.
 
 See,
 
 e.g.,
 
 Floyd v. State,
 
 [Ms. CR-05-0935, Aug. 29, 2008] — So.3d - (Ala.Crim.App.2007) (opinion on return to remand);
 
 Washington v. State,
 
 [Ms. CR-05-1297, Jan. 12, 2007] — So.3d - (Ala.Crim.App.2007);
 
 Gamble v. State,
 
 791 So.2d 409 (Ala.Crim.App.2000);
 
 Gaddy v. State,
 
 698 So.2d 1100 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997) (all murder/robbery).
 

 For the reasons expressed here, we now affirm Yancey’s conviction and sentence.
 

 AFFIRMED.
 

 WISE, P.J., and WELCH, WINDOM, and KELLUM, JJ., concur.
 

 [1]
 

 . This is Yancey’s second trial. He was convicted of capital murder for intentionally murdering Mattie "Pee-Wee” Sports during the commission of a robbery in his first trial. However, this court reversed that conviction on appeal. See
 
 Yancey v. State,
 
 813 So.2d 1 (Ala.Crim.App.2001).
 

 [2]
 

 . There were actually two cash registers maintained at the store, but the register which Sports had been using had already been “locked down."
 

 [3]
 

 . This specific contention was also the main argument Yancey raised in his motion concerning the alleged necessity for expert witnesses. He also requested fuller discovery of the State’s DNA evidence, and the trial court subsequently granted the request by order.
 

 [4]
 

 . Skin tags are present when the hair is ripped out from the scalp so that fragments of skin remain on the hair sample.
 

 [5]
 

 . This potential juror was also related to the presiding circuit judge in the present case.
 

 [6]
 

 . The "-4” is included in the case number written on the certified copy.
 

 [1]
 

 . The original opinion in this case was authored by Judge H.W. "Bucky” McMillan. The case was reassigned to Judge Main on return to remand.